**MAYER v. GARVAN, Alien Property Custodian, et al.**

**GARVAN, Alien Property Custodian, et al. v. MAYER.**

(Circuit Court of Appeals, First Circuit. January 17, 1922.)

Nos. 1517, 1518.

1. Partnership ⊂⇒268—War dissolves partnership with enemy subjects.

Under the law of the United States, war dissolves a partnership between a citizen and subjects of the enemy.

2. Partnership ⊂⇒2—Governed by American law as to American members and business.

A partnership between an American citizen and subjects of the enemy is governed by the law of the United States, in so far as it related to the American partner and the business conducted here.

3. International law ⊂⇒10—Foreign court cannot appoint absence trustee for American citizen.

A German court was without authority to appoint an absence trustee for an American citizen in matters relating to the dissolution of a partnership between the citizen and German subjects.

4. War ⊂⇒15—Trading with enemy unlawful before enactment of statute.

After the declaration of war, all trading or commercial intercourse between American and German partners was unlawful, and opposed to the public policy of United States, even before the enactment of Trading with

---

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the Enemy Act, Oct. 6, 1917, section 7(b) of which (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d), recognized that previous trading with the enemy was illegal.

**5. Partnership ☞261—Executory agreement to dissolve partnership with enemy in contemplation of war is invalid.**

An executory agreement made between an American citizen and German subjects, after the severence of diplomatic relations and in contemplation of war between the two countries, which provided a method for dissolution of the partnership, to become effective on the declaration of war, was invalid to transfer to the American partner the interest of the German partner.

**6. Partnership ☞261—Act of enemy partners cannot raise implied agreement, which they could not make.**

Since an express agreement by German partners to transfer their interest in this country to an American partner after the declaration of war would be invalid, no such agreement can be implied from the conduct of the German partners in taking possession of the German assets and conducting the business as if the American was no longer a member of the firm.

**7. War ☞15—Bill before peace cannot ratify act which could not have been authorized.**

Since an American citizen could not, before the declaration of peace with Germany, have agreed with his German partners as to disposition of the firm assets, the filing by him of a bill to reclaim from the Alien Property Custodian the firm assets in this country, which had been seized by the Custodian, cannot be given effect as a ratification of the acts of the German partners in transferring the American assets to the American partner.

**8. War ☞15—Ratification of contract dissolving partnership is "completing contract, agreement, or obligation"; "trade."**

In Trading with the Enemy Act Oct. 6, 1917, § 2 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa), defining the words "to trade" as entering into, carrying on, or completing any contract, agreement, or obligation, the ratification of a contract made by enemy partners dissolving the partnership would be the completing of a contract, agreement, or obligation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Trade.]

**9. Partnership ☞282—American partner has lien on assets of foreign firm.**

An American citizen, who had been in partnership with German subjects before the war, has a lien on the assets of the firm in this country for his share of the capital and profits.

**10. War ☞12—American partner held entitled to possession of firm assets.**

An American citizen, who had been in partnership with German subjects before the war, is entitled to recover possession of such assets from the Alien Property Custodian by a bill under Trading with the Enemy Act Oct. 6, 1917, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), but must account to the Alien Property Custodian for the interests of his enemy partners, under section 8(a), being section 3115½dd.

Anderson, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the district of Massachusetts; George H. Bingham, Judge.

Suit by Richard Mayer against Francis P. Garvan, Alien Property Custodian, and others, to claim property seized by the custodian. From a decree requiring redelivery of the property to the plaintiff, for

dissolution of the partnership, and for an accounting of the interest of enemy partners therein, both parties appeal. Modified and affirmed.

Edward F. McClennen, of Boston, Mass. (Guy Murchie and Murray F. Hall, both of Boston, Mass., on the brief), for plaintiff.

Elias Field, Sp. Asst. Atty. Gen. (Dean Hill Stanley, Sp. Asst. Atty. Gen., on the brief), for defendants.

Before JOHNSON and ANDERSON, Circuit Judges, and HALE, District Judge.

JOHNSON, Circuit Judge. These are appeals from a final decree in equity of the District Court of Massachusetts upon a bill brought under section 9 of chapter 106, Act of October 6, 1917, 40 Statutes at Large 411 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), known as the Trading with the Enemy Act. By section 7 (c) of the act, as amended (Comp. St. Ann. Supp. 1919, § 3115½d), it is provided:

"If the President shall so require any money or other property * * * choses in action, and rights and claims of every character and description owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of, an enemy or ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or the same may be seized by the Alien Property Custodian."

At the end of the war with Germany any claim of an enemy or ally of an enemy to said property is to be settled as Congress may direct. The only action taken by Congress in regard to such property was that contained in its joint resolution of July 2, 1921, terminating the state of war, in which it is provided in substance that all enemy property which had been seized should be retained by the United States until the governments with which the United States had been at war shall have made suitable provision for the satisfaction of all claims of citizens of the United States against them growing out of the war or otherwise.

Section 9 of the act authorizes one not an enemy or an ally of an enemy, who claims any interest in the property transferred or seized under the act, to institute a suit in equity in the Disrict Court of the United States for the district in which he resides to establish his claim.

Section 2 (a) of the act defines the word "enemy" as an individual partnership or other body of individuals of any nationality resident within the territory, including that occupied by the military and naval forces of any nation with which the United States is at war.

By executive order of February 26, 1918, the title and interest of the enemy property which may be seized is defined to include "such as might or would exist if the existing state of war had not occurred."

On May 18 and September 20, 1918, the Alien Property Custodian, after due investigation and determination, took possession in the district of Massachusetts of the capital stock of two Massachusetts corporations and also of certain securities and notes receivable, as the property of Reis & Co., a partnership, whose address was Heidelburg,

Germany.    The book value of all of this property approximates $910,000.

The firm of Reis & Co., prior to 1913, consisted of Edwin Reis and Ludwig Reis, residents of Germany, and Karl B. Strauss, a naturalized citizen of Great Britain, but a German by birth.   This firm had succeeded to the business of importing cotton waste from America into Germany, formerly conducted by Wilhelm Reis, father of Edwin and Ludwig Reis.

Richard Mayer was born in Germany, but took out naturalization papers in the United States in 1912.   In 1898 he was sent to Boston by the firm of Reis & Co. to take the place of an agent there and continued in its employ until 1907 or 1908, having a bonus interest in profits.   After leaving the employ of this firm he organized a similar business which he conducted on his own account.   In 1913 he went to Germany and entered the firm of Reis & Co. as an "additional, personal, liable partner."

In the articles of partnership executed at that time the following introductory statement appears:

"Under the firm name of Reis & Co., with the main seat at Friedrichsfeld, branch at Heidelburg, there exists a partnership."

The names of the personal, liable partners are then given, and also that of a special partner, Mrs. Wilhelm Reis.   In its first paragraph it is provided that Mr. Mayer shall take his domicile in Boston and conduct the American business of the partnership.   The articles of partnership also provided that Mr. Mayer should bring into the partnership his firm business which he had conducted in Boston, with all its assets and liabilities, appraised at 200,000 marks; that Edwin Reis should contribute to the capital of the firm 1,179,845.03 marks, Ludwig Reis, 1,136,867.26 marks, and Karl B. Strauss 348,313.24 marks.   The amount contributed by Mrs. Wilhelm Reis as a special partner did not appear; but it was provided that she was to have interest on her investment, whatever it was, at 4½ per cent., but should not participate in gain or loss.   Each of the partners was to receive interest at 4½ per cent. upon the capital he furnished and a fixed salary, and was entitled to draw in the course of each partnership year from the firm an amount equal to his salary and the interest due him on his investment.   The participation in gain or loss was to be as follows: Edwin Reis, 27½ per cent.; Ludwig Reis, 27½ per cent.; Karl B. Strauss, 25 per cent.; and Richard Mayer, 20 per cent.   Shares of profit, as well as any amount due for compensation not drawn by any partner during the partnership year, and interest, were to be credited to the capital account of the partners.

In October, 1914, the complainant caused the Richard Mayer Company, one of the corporations whose stock was transferred to the Alien Property Custodian, to be organized as a Massachusetts corporation, and paid in all the capital stock of that company from the assets of Reis & Co. in his hands.

In 1915 he caused the organization, under the laws of Massachusetts, of the Anglo-American Cotton Company, the other corporation,

and paid in all the capital stock of that company from the assets of Reis & Co.

During the latter part of the year 1914 and the early part of 1915 the German partners remitted to the complainant at Boston about $2,500,000, for the purchase of cotton waste for export. With this money some cargoes of cotton waste were purchased and shipped to Europe, and the balance was used in paying for the capital stock of the corporations that were organized and in the purchase of the securities that were seized.

At the death of Mrs. Wilhelm Reis, in 1916, it became necessary under German law to secure the signatures of the surviving partners to a declaration that she was no longer a member of the firm, and, as it was not possible at that time to reach Richard Mayer, his brother, Karl Mayer, a resident of Germany, was appointed his "absence trustee" under German law.

February 3, 1917, diplomatic relations with Germany were broken off by the United States.

On February 7, 1917, members, in Germany, of the firm of Reis & Co. and the "absence trustee," appreciating that war between Germany and the United States was imminent, signed the following document:

"Friedrichsfeld, February 7, 1917.

"Reis & Co. Friedrichsfeld (Baden):

"In consideration of the present disturbed condition and the possibility of a warlike entanglement with the United States of America the undersigned reached to-day the following agreement:

"In case of a war between the United States and Germany, Mr. Richard Mayer separates himself from the firm of Reis & Co. The distribution of the partnership's assets which then becomes necessary, is agreed to take place on the following basis:

"Mr. Richard Mayer renounces all of his claims that he may have against the assets of the firm of Reis & Co. in so far as they are located in Europe, in favor of the remaining partners: Edwin Reis, Ludwig Reis, and Karl B. Strauss.

"On the other hand, the partners, Edwin Reis, Ludwig Reis, and Karl B. Strauss, renounce any claims they may have against the assets of the firm of Reis & Co. as far as those assets are located in the United States, in favor of Mr. Richard Mayer.

"With the taking over by Mr. Richard Mayer of all of the assets of the firm of Reis & Co., which are located in the United States of America, any and all claims on the part of Mr. Richard Mayer against the complete assets of the firm of Reis & Co. are once and for all settled.

"On the other hand, the partners Edwin Reis, Ludwig Reis, and Karl B. Strauss declare that, with their taking over of that part of the European assets of the firm which represents Mr. Richard Mayer's share, they renounced unequivocally all claims against any assets of Reis & Co. located in the United States of America.

"This agreement has been issued in quadruplicate and a copy handed to each of the contracting parties.

"Friedrichsfeld, February 7, 1917.

"Edwin Reis.
"Ludwig Reis.
"Karl B. Strauss,
"Karl Mayer,
"As Legal Absence Trustee for Richard Mayer of Boston."

Richard Mayer did not learn of the existence of this document until the spring of 1919, and it does not appear that he had any knowl-

edge until then that an "absence trustee" had been appointed for him.

War was declared by the United States against Germany April 6, 1917, and after that date the German partners treated the German assets as their own and conducted the business in Europe as if Richard Mayer had no interest in it.

[1] The District Court has ruled that war dissolves a partnership under the law of England and the United States, and this ruling is fully supported by the authorities cited, among which are Griswold v. Waddington, 16 Johns. (N. Y.) 438; The William Bagaley, 5 Wall. 377, 18 L. Ed. 583; Hanger v. Abbott, 6 Wall. 532, 18 L. Ed. 939; The Anglo-Mexican, 118 L. T. N. S. 260 (Privy Council); Hugh Stevenson & Sons, Ltd., v. Aktiengesellschaft Für Cartonnagen Industrie, [1918] A. C. 239, 118 L. T. N. S. 126 (House of Lords), 115 L. T. N. S. 594 (C. of A.).

[2, 3] The District Court further ruled that the contract of partnership, so far as it related to the American partner and the business conducted here, was in case of war to be governed by the law of the United States, which "does not sanction continuation of business relations between its citizens and citizens of a nation with which it is at war"; that the agreement of February 7, 1917, was invalid under German law, because it lacked judicial or notarial authentication; and that, as Richard Mayer was not a subject of Germany, the German court was without authority to appoint an "absence trustee" for him.

We are satisfied with these rulings and the reasoning by which they are supported; but, for additional reasons, we think the agreement, if valid under German law, was ineffective to transfer the interest of the German partners in the American assets to Richard Mayer. It was executory, and made, as stated therein, in contemplation of war, and to take effect only in the event that war was declared.

Mr. Strauss, one of the partners, testified that it was made for the purpose of preventing the confiscation of partnership assets by Germany, and it is so obvious that, if valid, it would defeat the right of the United States as a belligerent to seize the interests of German partners in American assets, that this also seems to have been its purpose.

[4] After the declaration of war, and before the passage of the act, all trading or commercial intercourse between the American and German partners was unlawful and opposed to the public policy of the United States. The Rapid, 8 Cranch, 155, 3 L. Ed. 520; The Julia, 8 Cranch, 181, 193, 3 L. Ed. 528; United States v. Grossmayer, 9, Wall. 72, 19 L. Ed. 627; Insurance Co. v. Davis, 95 U. S. 425, 429, 24 L. Ed. 453, in which Justice Bradley said:

"That war suspends all commercial intercourse between the citizens of two belligerent countries or states, except so far as may be allowed by the sovereign authority, has been so often asserted and explained in this court within the last 15 years, that any further discussion of that proposition would be out of place. As a consequence of this fundamental proposition, it must follow that no active business can be maintained, either personally or by correspondence, or through an agent, by the citizens of one belligerent with the citizens of the other. The only exception to the rule recognized in the books, if we lay out of view contracts for ransom and other matters of absolute necessity, is that of allowing the payment of debts to an agent of an

alien enemy, where such agent resides in the same state with the debtor. But this indulgence is subject to restrictions. In the first place, it must not be done with the view of transmitting the funds to the principal during the continuance of the war, though, if so transmitted without the debtor's connivance, he will not be responsible for it."

It is evident from the act itself that Congress realized that, without the passage of the act and at common law, trading with the enemy was illegal, for it provided in section 7 (b) that nothing in the act shall be taken "to recognize as valid or legal" trade with the enemy before passage of the act and after the beginning of the war, and it further expressly provides that contracts made in contemplation of war shall not be included among those which, though executed before the war, but to be performed after its declaration, are recognized as legal.

In order to make certain that the title of enemy property which might be seized should not be affected by the declaration of war, the President, by executive order of February 26, 1918, defined the title and interest of enemy property which may be seized to include "such as might or would exist if the existing state of war had not occurred."

[5, 6] The German partners could make no agreement with the complainant after a declaration of war that would be recognized as valid in our courts, and therefore no executory agreement entered into before the war, and in contemplation of it, could be effective to transfer their interest to him in the American assets after war had been declared. This case is distinguishable from Wilson v. Ragosine & Co., [1915, K. B.] 113 L. T. N. S. 47, because in that case the agreement for dissolution of the partnership was made on the day before the declaration of war and was completely executed before war was declared. The fact that the German partners took possession of all of the assets of the firm in Germany, and conducted the business there as if the complainant were no longer a member of the firm, could not transfer their interests in the American assets to him; for, if no contract made by them after war had been declared, to transfer such interests, would receive the sanction of an American court, no such contract or agreement could be implied from their acts after the declaration of war. Thy could not do by acts what they could not do by words.

[7] It is contended that complainant, by filing this bill, ratified the agreement of February 7, 1917; but he was under the same disabilities as his partners in regard to commercial intercourse between them, and there was no time after the declaration of war until Congress declared the state of war to be at an end, July 2, 1921, that he could have, by any communication or negotiation with his former partners, ratified the alleged agreement, and if he could not ratify by communication or negotiation with them, he could not by the act of filing this bill.

[8] In the Trading with the Enemy Act, Congress, in section 2 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa), defines the words "to trade":

"(a) Pay, satisfy, compromise, or give security for the payment or satisfaction of any debt or obligation."

278 F.—3

"(c) Enter into, carry on, complete, or perform any contract, agreement, or obligation.

"(d) Buy or sell, loan or extend credit, trade in, deal with, exchange, transmit, transfer, assign, or otherwise dispose of, or receive any form of property.

"(e) To have any form of business or commercial communication or intercourse with."

Ratification of the alleged agreement would certainly be the completion of a "contract, agreement, or obligation."

[9] Whether title to the American assets after the declaration of war was in the partnership as a legal entity, or in the former partners as joint owners in proportion to the shares to which each might be entitled after liquidation, complainant had an equitable lien upon all the American assets to secure the distributive share which might be due him after liquidation, and also to secure the payment of partnership debts.

Under the partnership articles the complainant is entitled upon distribution to have repaid him out of the assets of the partnership the amount of his capital investment, with interest, and also 20 per cent. of the net profits which had been earned by the partnership, and he is liable for 20 per cent. of all losses.

The District Court has found and decreed:

"That, upon the present state of the evidence, this court is unable to state an account as between the parties, or Richard Mayer and the Alien Property Custodian, there being no evidence of the actual value of the American property or of the German or English property, and there being no evidence of the liabilities of the firm."

We think this finding and decree is fully sustained by the record.

[10] Because of complainant's equitable lien as a partner, he was entitled to possession on April 6, 1917, of all the partnership property under section 8 (a) of the act (section 3115½dd), the material parts of which are as follows:

"That any person not an enemy or ally of enemy holding a lawful mortgage, pledge, or lien, or other right in the nature of security in property of an enemy or ally of enemy which, by law or by terms of the instrument creating such mortgage, pledge, or lien, or right, may be disposed of on notice or presentation or demand * * * may continue to hold said property, and after default may dispose of the property in accordance with law * * * under such rules and regulations as the President shall prescribe. * * * Provided further, that if, on any such disposition of property, a surplus shall remain after the satisfaction of the mortgage, pledge, lien, or other right in the nature of security, notice of that fact shall be given to the President pursuant to such rules and regulations as he may prescribe, and such surplus shall be held subject to his further orders."

Under this section the District Court has decreed:

"That the complainant on the dissolution of the partnership with the outbreak of war had a lien on the American assets and their proceeds for what was due him from the partnership on an accounting of the affairs of the partnership and was entitled to retain the American assets in his hands until the satisfaction of the amount due him on such accounting."

"That the plaintiff is entitled to the immediate repossession of all property so seized and the net proceeds arising therefrom; that the plaintiff shall hold possession of the money and property so delivered to him under the terms and provisions of section 8 (a) of the Trading with the Enemy Act, and

of the rights and duties in respect thereof which are set forth in paragraph 10 of this decree."

It was not the purpose of Congress in the passage of the act to deprive an American citizen of his property rights or to so administer the act as to cause him unnecessary financial loss. It can be easily conceived that the American partner, because of his knowledge of the partnership business and the value of its assets, could realize more from the firm assets upon liquidation than the Alien Property Custodian; and a serious financial loss might be caused him if the liquidation were conducted by one with no experience in the business of the partnership and with less knowledge of the values of the firm assets than that possessed by him.

The decree of the District Court is amended by striking therefrom paragraphs 12 and 13, and inserting in place thereof the following:

"12. That the defendant Francis P. Garvan, as Alien Property Custodian, is entitled, out of the surplus of the money and property in controversy in this cause which may remain after the satisfaction of the distributive share of the plaintiff on accounting, to the allowance of reasonable fees and expenses for services herein rendered by Elias Field, Esq., who appeared as his counsel in this behalf; that the sum of $10.000 is found to be a reasonable allowance for said Elias Field to cover his services and expenses in this behalf; and that no allowance be made for the services of George P. Rowell.

"13. It is therefore adjudged, ordered, and decreed as follows:

"First. That such allowances shall not be deemed to be an obligation of the said Garvan individually, or as such Custodian, but merely a charge against such credits as he may be entitled to upon an accounting by the plaintiff.

"Second. That all of the property in the hands of the said defendants, Alien Property Custodian and Treasurer of the United States, be by them respectively delivered into the possession of the plaintiff.

"Third. That the plaintiff shall hold possession of the money and property, so delivered to him, under the terms and provisions of section 8(a) of the Trading with the Enemy Act and with the rights and duties in respect thereof which are set forth in paragraph 10 of this decree."

So modified, the decree of the District Court is affirmed, with costs to neither party, and the case is remanded to that court for further action not inconsistent with this opinion.

ANDERSON, Circuit Judge (dissenting). I regret that I cannot concur in the result reached by the majority of the court. I think it so perverts the Trading with the Enemy Act as to make it unnecessarily harmful to American citizens and probably ultimately advantageous to Germans.

At the outset it should be held clearly in mind that the case before us does not involve the right of the Custodian to seize the property in question. It involves only his right to retain it, or, as the case now stands, to retake a portion of it after accounting by the plaintiff. This anomalous and somewhat confusing situation—of a right to seize what may not be lawfully retained—arises out of the necessities of war. It is expressly contemplated by the act. Compare Central Trust Co. v. Garvan, 254 U. S. 554, 566, 41 Sup. Ct. 214, 65 L. Ed. 403, where, for the purposes of immediate possession, the determination of the Custodian was held conclusive, "whether right or wrong." In some cases, including the opinion of the court below, are expressions

as to the Custodian's right to seize, when what is really meant is the Custodian's right to retain. It is solely with the right to retain, or condemn as alien enemy property, that this case is concerned. The seizure by the Custodian neither made, destroyed, nor affected any rights now in question.

In the view I take of this case, the salient facts are within narrow scope. Many of the details set forth in the majority opinion seem to me to have no bearing on the real case.

In 1916, Reis & Co. was a partnership made up of one American and two (or three) Germans. A part of the assets were in America, under the direct control of the American partner, the rest in Europe. Dissatisfied with the business relations, the American partner, through an agent indicated in 1916 to the German partners a tentative desire to dissolve the partnership and to liquidate without a detailed accounting; he taking all the American assets, and they all the German assets.

On February 7, 1917, after the breach of diplomatic relations, and while communication with Germany was impossible, the German partners executed a document, set forth in full in the majority opinion, intended to be an agreement in contemplation of war, for the dissolution and liquidation (both) of the partnership affairs—to take effect contemporaneously with the outbreak of war—on exactly the terms indicated by the American partner a year before. At that time, as the District Court found, the American assets were, so far as the Germans knew, not far from the American partner's proportion of the total American and European assets. This document was signed by the American partner's brother, purporting to act as "absence trustee" under a court appointment. It was to take effect, not after, but eo instanti with, war. This distinction is important, and seems to be overlooked by the majority. It purports to release the American assets from all claims of the Germans, while asserting for them full title in all the European assets, and the Germans thereupon appropriated to their own use all the European assets in such fashion, as to make it probably impossible thereafter to state an account with even approximate accuracy.

The decision here, as in the court below, goes upon the theory that the agreement of dissolution and liquidation was void; that it had no effect upon the rights of the German partners to an ultimate accounting for the American assets; that, therefore, the plaintiff must now account for "enemy property" in the American assets.

I cannot accept that theory. I think that agreement was consonant with our public policy—indeed, in aid of it. By it the parties simply agreed to the dissolution which the law would have made, if the parties had not.

They also agreed to an instant liquidation, in specie—now claimed to be advantageous to the American partner. I cannot understand how our public policy can be impaired by an agreement giving an American citizen his share in full, or even overflowing, measure. Such an agreement certainly lends no aid to the public enemy; it is very helpful to our own citizen.

See the pungent opinion of Halsbury, L. C., in Jansen v. Dreifontein Mines Co., [1902] A. C. 484, 489 et seq.

See the case of Hugh Stevenson, etc., v. Aktiengesellschaft, [1918] A. C. 239; same case in the court below, [1917] 1 K. B. 842. In the seven opinions of the Lords and Lord Justices dealing with the results of the outbreak of war on such a partnership, most aspects of the questions now involved are expressly or impliedly dealt with.

Consider the situation that the outbreak of the war would have left the partners in, without any agreement: Under American law, the partnership would have been dissolved; the American partner would hold the American assets as his own up to the amount of his interest, and no more. The ultimate right of the Germans to a full accounting would, unless the United States decided to confiscate, be simply suspended during the war. Under German law the partnership was not dissolved. The Germans were, nevertheless, as this record shows, in danger of having their business seized by the German government, because of alleged American interests in it. Under such circumstances, the interests of the parties drove them to exactly the course that the law required: A severance of their business relations, advantageous, at least during the war, to the nationals of both countries. There was only one way they could sever. Communication was impossible; they guessed, or roughly estimated, the amount of assets, and divided the assets, American and European, on national lines, in specie. It happened, as the government contends, that the American got the better of the bargain. But, if he had got the worst of the bargain, he would, in this country, be remediless. In that event he could keep as his own the American assets, and, now that the war is ended, resort to litigation in Germany for the balance due.

Otherwise put: The agreement, if bad, is bad solely because the American assets happened to equal or exceed the American partner's share in a liquidation made strictly in accordance with the partnership articles.

No case is cited by the majority of the court, or by counsel for the Custodian, in support of the proposition that such agreements in contemplation of war are contrary to public policy. There is no allegation by the Custodian that Mayer was to take a surplus on secret trust for the Germans. So far as this record shows, all Mayer has done throughout is to comply with all the demands of the Custodian and bring this suit—in which he was not even called as a witness. We must assume that, if the government could show that the liquidation was in any way intended for the benefit of alien enemies, it would have alleged and proved it. On this record, we are making rulings as applicable to Mayflower descendants as to naturalized Germans.

So far as the agreement of dissolution and liquidation in contemplation of war is concerned, the case is on all fours with Wilson v. Ragosine Co., [1915, K. B.] 113 L. T. N. S. 47, where a similar agreement as to dissolution and liquidation was made on August 3, 1914, the day before Great Britain declared war, and was sustained by the court. On the same point, see, also, Jansen v. Driefontein Mines Co., supra.

Judge Bingham in the District Court does not seem to have regarded an agreement advantageous to an American citizen as contrary to public policy. But he held it void because of failure to comply with the technical requirements of the German Code as to absence trustees.

In my view, the German Code has no application. I think the contract as to the American assets must, as all of us in both courts hold as to dissolution of the partnership by war, be construed under American law—the law of the place of performance. See Pritchard v. Norton, 106 U. S. 124, 1 Sup. Ct. 102, 27 L. Ed. 104; Hamlyn v. Talisker, 1894, A. C. 202. The authorities would warrant us in holding that plaintiff's brother acted as agent of necessity. Buford v. Speed, 74 Ky. (9 Bush) 338; Mayer v. United States, 3 Ct. Cl. 249; United States v. Lapene, 17 Wall. 601, 21 L. Ed. 693; Williams v. Paine, 169 U. S. 55, 18 Sup. Ct. 279, 42 L. Ed. 658; Sheanon v. Insurance Co., 83 Wis. 507, 53 N. W. 878.

But if the plaintiff's brother acted as previously unauthorized agent, so that his act may require ratification by conduct or otherwise, I think there was such ratification, as the District Court found, by bringing this suit. In this suit the court, not the plaintiff, caused notice to be given to the German partners. For an American citizen to bring a suit in the courts of his own country, alleging his contentment with a liquidation of his former partnership, made by his former partners, is not trading with the enemy. Jansen v. Driefontein Consol. Mines, supra. Notice having been given by the court to the Germans of Mayer's acquiescence in what the Germans had done, I cannot see why Mayer is not now bound, precisely as though he had originally authorized his brother to act as his agent in that transaction. At any rate until he disaffirms, if he can disaffirm, the liquidation stands. He has not disaffirmed. How could Mayer disaffirm, when he could not legally communicate with the Germans? To have attempted disaffirmation before peace was made might well have been held trading with the enemy. Was it his duty to disaffirm in this suit?

The Germans, therefore, have and had at the time of the seizure no rights in the American assets. There was no "enemy property" within the meaning of the act. Only positive acts of disaffirmance by Mayer after full knowledge would reinstate the Germans in their original rights to a full accounting. The seizure neither created nor affected any rights now under consideration. It may, as the government contends, have been "analogous to an attachment" (Kohn v. Kohn, Inc. [D. C.] 264 Fed. 253) to make sure the property is "forthcoming if finally condemned," but it "does no more" (Central Trust Co. v. Garvan, 254 U. S. 554, 569, 41 Sup. Ct. 214, 65 L. Ed. 403). The analogy is not complete, it may mislead. The seizure was not a right-creating proceeding; it was merely a right-securing proceeding. What, if anything, the Germans had, the Custodian seized, and may retain until Congress otherwise provides. But the measure of the Custodian's right to hold is the extent of the Germans' rights; and they had and have none as to the American assets. If, as is argued, the liquidation agreed to by the Germans, and made by them so far as they could make it, was advantageous to the American, can the Custodian

compel the American citizen to disaffirm—for the ultimate benefit of our former enemies—unless we abandon our traditional policy as to confiscation? Compare Kershaw v. Kelsey, 100 Mass. 561, 570, 97 Am. Dec. 124, 1 Am. Rep. 142, where there is a long and learned review of enemy trading law by Mr. Justice Gray. See, also, Brown v. United States, 8 Cranch, 110, 3 L. Ed. 502; Hanger v. Abbott, 6 Wall. 532, 537, 18 L. Ed. 939.

But, entirely apart from ratification by bringing this suit, the Germans were barred by what they signed and did. For present purposes it was not necessary that the contract of liquidation should be contemporaneously bilateral. In re Portuguese Mines, 45 Ch. Div. 16; Thompson v. Williams, 58 N. H. 248; Manchester Street Ry. Co. v. Williams, 71 N. H. 312, 320, 52 Atl. 461.

Whether we regard the transaction of February 7, 1917, as a waiver, a release, or an option to Mayer by the Germans, it is clear that until, after full knowledge of what had been done, Mayer had insisted on a full accounting, the Germans could maintain against him no bill for an accounting. What they signed and did ended their rights in the American assets, unless and until Mayer asserted continuing rights in the European assets.

Test the question by assuming that peace had been made in September, 1917, before the Trading with the Enemy Act was passed, restoring to the Germans all their ante bellum rights in our courts and as to property in this country, and that they had then brought against Mayer a bill for a full accounting of all the partnership assets, American and European, that Mayer had pleaded the agreement of February 7, 1917, and their appropriation of all the European assets to their own use, and that he had seasonably, after knowledge, ratified such liquidation in specie; would any court have sustained the Germans' bill for an accounting?

Plainly, the majority opinion goes on the theory that there should be an accounting because, and only because, the liquidation made by the Germans was advantageous to the American. If the accounting to the expense of which we are to subject the American partner shows no surplus for the Germans, the Custodian takes nothing. Nor is there any provision to reimburse the American for expenses incurred in an accounting for the prospective benefit of our (former) enemies.

But the act was intended to cripple German enemies, not to harm American citizens. A construction so inconsistent with its manifest purpose should not be adopted, even if there were—as there is not—language even superficially capable of such meaning. Compare Trinity Church v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226; and cases cited and reviewed. Douglas v. United States, 14 Ct. Cl. 1.

I repeat, the Custodian can now retain (or retake after an accounting) nothing that the Germans could not, assuming the war barriers removed, recover in a suit for an accounting.

Reverting again to the proposition that the government acquired by the seizure rights in the American assets that could not be cut off by the ratification—the point where my views diverge from Judge

BINGHAM'S—as I read the opinion of the Supreme Court in Central Trust Co. v. Garvan, 254 U. S. 554, 569, 41 Sup. Ct. 214, 65 L. Ed. 403,,the court there held that seizure created no rights, certainly no rights beneficial primarily or ultimately to enemies. Undoubtedly the Custodian, if he has seized property shown finally to belong to American citizens, may, having "all the powers of a common-law trustee," sell it, remitting the owner to a claim for the proceeds. Damage from such proceeding is one of the risks the war imposed on our own citizens. But I find nothing in section 9, nor elsewhere in the act, indicating that seizure, either "with the strong hand" (254 U. S. 568, 41 Sup. Ct. 214, 65 L. Ed. 403) or by "resort to the courts," transmutes citizen property into enemy property or otherwise broadens the power of final condemnation. The closing sentences in the opinion of Mr. Justice Holmes in Central Trust Co. v. Garvan, supra, sustaining the right of the Custodian to maintain "purely possessory actions," are:

"The present proceeding gives nothing but the preliminary custody such as would have been gained by seizure. It attaches the property to make sure that it is forthcoming if finally condemned and does no more."

Douglas v. United States, 14 Ct. Cl. 1, and Mayer v. United States, 3 Ct. Cl. 338, look the same way in favor of such construction of trading with the enemy acts as not to invalidate transactions beneficial to citizens unless actually lending aid to enemies. The views expressed by Mr. Justice Gray in Kershaw v. Kelsey, supra, on full review of the authorities, lend further support for my conclusions. In 100 Mass. 573, 97 Am. Dec. 124, 1 Am. Rep. 142, Mr. Justice Gray said:

"At this age of the world, when all the tendencies of the law of nations are to exempt individuals and private contracts from injury or restraint in consequence of war between their governments, we are not disposed to declare such contracts unlawful as have not been heretofore adjudged to be inconsistent with a state of war."

In the majority opinion it is said:

"Mr. Strauss, one of the partners, testified that it was made for the purpose of preventing the confiscation of German assets by Germany, and it is so obvious that, if valid, it would defeat the right of the United States as a belligerent to seize the interests of German partners in American assets, that this also would seem to have been its purpose."

I do not so construe the record. The purposes as shown both by the evidence and by the agreement were to leave no American interest in German assets which might cause the German government to seize the business over there on the same theory upon which our government has proceeded against the business here.

Another Strauss, an expert on German law, testified that the German government would not object to the dissolution and liquidation agreement, "because German nationals would acquire additional property." This seems to me the sound view. Nor would the agreement "defeat the rights of the United States as a belligerent to seize the interest of German partners as American assets," except as ending business relations between Germans and Americans that ought to have been ended would lessen the occasions for sequestration. Seizure and (possible) subsequent confiscation are merely aids to the general policy

of nonintercourse between enemies, and of furnishing a means of crippling and punishing enemies, not of injuring citizens.

The act was not intended to cause the accumulation in the Custodian's hands of a huge conglomeration of properties largely of American ownership, or to prevent Germans and Americans from completely severing business relations on the outbreak of war, so that each set of nationals might be free from temptation for disloyal dealing with enemies. It was not intended to prevent Germans from releasing, if and when war should be declared, possibly valuable rights to Americans. The William Bagaley, 5 Wall. 377, 407, 408, 18 L. Ed. 583; The Anglo-Mexican, [1918] A. C. 422.

In my view, the agreement of February 7, 1917, is one that ought to be sustained, as directly in furtherance of public policy.