CHIEF JUSTICE WILLIAMS
delivered the opinion of the court:
April 14, 1862, by virtue of a decretal order of the Louisville chancery court, the house and sixteen acres of land of appellees, near the city of Louisville, was sold to pay a remainder of purchase price, at which sale *363 Crutcher became the purchaser, at the price of seven thousand and fifty-seven dollars and sixty cents. Hord and wife then resided in the State of Mississippi, and were not in Kentucky.
It is abundantly established, that at this seile there were numerous persons, several of whom desired to purchase the property, most, if not all, of whom were prevented from bidding, because Crutcher publicly announced that he was purchasing, or intended to purchase, the property for the owners; and the amount to be raised having been bid for the twenty-five acres, the proposition was then made by the marshal executing the order of sale, who would pay the debt for the least number of acres, when some one bid a less number, which drew from Crutcher the remark, in a manner indicating his displeasure, that it mattered not to him how little he got, as he would purchase it for the owner’s benefit; and the bidder being admonished by another person that he was only injuring the owner, ceased bidding. Also, that Crutcher had agreed with the agent of Hord and wife, who had acted for them before the late war broke out, to purchase this property for their benefit.
The property bought was, at the time, worth from ten to fifteen thousand dollars. The house was commodious and comfortable, and the place a desirable residence, and which, February 12, 1864 — less than two years after-wards — he sold at fifteen thousand dollars. The rents were proven to be worth from five hundred dollars to seven hundred dollars per annum during the war, and one thousand dollars afterwards.
After the cessation of hostilities and the restoration of peace, Hord and wife brought this suit to obtain the property on the payment'of the price paid by Crutcher, and seeking a settlement of rents and interest; but if *364 this could not be done;-then that Crutcher should be compelled to pay over the amount received by him, deducting the purchase price, and for an account of rents and interest.
The court below dismissed the petition as to the purchaser, Alexander, who was Crutcher’s vendee, regarding him as an innocent sub-purchaser, which this court affirmed. On a subsequent hearing, after submitting the matters in dispute between Crutcher and Hord and wife to a master and his report, the court adjudged against Crutcher nine thousand seven hundred and ninety-nine dollars, with interest thereon from November 22, 1867, being the amount ascertained by the master as due October 14, 1867, from which Crutcher prosecutes this appeal.
He now insists that there was no relation of trustee existing on his part towards Hord and wife; that he purchased and paid for said property with his own means; that he resided in Kentucky and they in Mississippi ; that the late war was then flagrant, and they stood in the relation of alien enemies to him; that there was no express, and could legally be neither an express nor implied, trust between him and them. As the war terminated the agency of the Kentucky agent of Hord and wife, it may, perhaps, be legally said that there was no express trust; but still, does not the conduct of Crutcher raise an implied trust for which he can be held responsible ?
In Estell vs. Estell (3 Bibb, 179), this court held, as far back as 1813, that the purchase of property under execution for the benefit of the debtor, at the instance of his wife, or, if not so made, he was guilty of a fraud, by having the advertisement of the sale taken down, by which means but few persons attended the sale and the property sold *365 for much less than its value. “ Whether, therefore, Ben Estell purchased the negroes for the use of Sam. Estell, or was guilty of a fraud in procuring the sale and purchase for his own benefit, in either point of view he has not acquired an absolute property in the negroes, and Sam. Estell is entitled to relief.”
In Partlow vs. Lane (3 B. Mon., 426), on bill by Lane, as a former partner and creditor of Chambers, to subject lands charged to be held in trust by Partlow for him, sold and purchased at execution sale, Partlow admitted in his answer, “ that on the day of sale Chambers remarked, that, as his land had to be sold, he would prefer respondent’s purchasing it to any one else, as he would have some chance of getting it back, to which respondent made no replyand that there was no other understanding between them. It appeared, however, says the court, that Chambers, relying on this implied agreement, represented to some of the bidders that Partlow was buying the land in for him, and requested them not to bid, and that some of the bidders were thus deterred, and that Partlow by this means obtained the land at a lower price than he would otherwise have done; and that, after the sale, he said, when he purchased the land he bought it in for Chambers, and did not then expect to pay for it himself.
The court, after showing that such an agreement does not of itself constitute a ground for avoiding the sale even by creditors, nor that the so obtaining the land at a reduced price brought it within the operation of the statute against fraudulent conveyances, and render it absolutely void as to creditors, yet they did consider Partlow “ as having acquired the legal title by the sheriff’s deed * * at a grossly inadequate price, occasioned in part, at least, by his agreement for the benefit of Chambers, *366 and by the improper conduct of Chambers caused by that agreement, and perhaps impliedly authorized by it, we are of opinion there was so much unfairness in the sale as that Parllow cannot conscientiously retain the land against the creditors of Chambers. * *' His' doing so would itself he a fraud.”
If the tearing down an advertisement, and the permitting a defendant to say to the persons present that the purchaser was buying for his benefit, should be regarded as being so far fraudulent as to make the purchaser a trustee, and hold the property for the use of the execution debtor or his creditors, much more so should it be when the purchaser himself, for the very purpose and with the effect of deterring other bidders, proclaims that he is so purchasing the property, and especially when he gets it at greatly less than it would then have sold for, as was the case in this instance.
The only remaining question is, whether the relative situation of the parties, at the time of purchase, forbids this relation of trustee and beneficiary ? Commercial intercourse was then prohibited, by the enactments of Congress and the proclamation of the President, between the citizens of Kentucky and Mississippi, and for many purposes they sustained the relation of alien enemies; yet even alien enemies have many rights as to each other, and in many instances the individual may not interpose when the government can.
Alien enemies may sustain the relation of debtor and creditor. If the debt existed prior to the war, only the right of action is suspended during hostilities, and revives with peace, unless the sovereign has intervened by way of confiscation; and even during the war, by the permit of the sovereign, this relation may be created, and it may also be created by necessity, without such license. An *367 alien enemy may be the devisee of real estate or the distributee or legatee of personalty; and if the Government takes no proceedings of confiscation or sequestration, it will be no defense to their claim when such relation has ceased by the termination of the war; and other rights might be named.
In Fairfax vs. Hunter (7 Cranch, 626), the Supreme Court of the United States held, that a devise to Dennis Fairfax, a resident of England, and an alien enemy, by a testator who died in Virginia during the war, of lands in Virginia, was not void. Justice Story, in the opinion, after stating Jjaat an alien may take by purchase and hold real estate until office found by the Government, said : “ The alien has complete dominion over the same; he is a good tenant of the freehold in a praecipe on a common recovery, and may convey the same to a purchaser. * * We do not find that, in respect to these general rights and disabilities, there is any admitted difference between alien friends and alien enemies. During the war, the property of alien enemies is subject to confiscation jure belli, and their civil capacity to sue is suspended; but as to capacity to purchase, no case has been cited in which it has been denied; and in the Attorney General vs. Wheeden, &c. (Park’s Rep., 267), it was adjudged that a bequest to an alien enemy was good, and after peace might be enforced. Indeed, the common law in-these particulars seems to coincide with the jus gentium.”
And in Beadwell vs. Weeks (1 Johnson’s Chy. R., 206), Chancellor Kent held, that a citizen and resident of England, who was an alien enemy, may take personalty as distributee, of one dying here during the war of 1812; and ordered the administrator to hold the funds until the war ceased, and denied the claims of the next of kin, *368 residing in this country, saying that the laws of war “impose no forfeiture or confiscation of property. They destroy no right, but onty suspend the exercise of certain rights. It is for the sovereign power * * * to determine when and how far, in cases unprovided for by treaty, the rights and property of alien enemies shall be imperiled by war.” It is true the Senate of New York, by the casting vote of its presiding officer, reversed this case; but all the judges were for affirmance, therefore it has the authority not only of Kent’s great name, but that of all the judges who sat upon the case.
How infinitely stronger is the case under advisement. Here the parties are citizens of the same great Republic, but of different States, then unexpectedly at war; but many constitutional rights pertain to both alike.
This was a proceeding in a Kentucky court in behalf of her citizen, against a non-resident, but a citizen of the United States, to compel him to pay a debt. It was his legal duty to pay it, else the judgment of sale was wrong. The creditor had a lien upon and a legal right to sell the property, else the judgment and sale were erroneous. If the creditor had a right to demand his debt, the debtor had the right to discharge it, else there would be the solecism of a right in the creditor to demand, but no right in the debtor to pay the debt. If the debtor had violated no legal' right of his creditor by withholding the debt, there would have been no cause of action. If the creditor had the legal right to have the property sold to pay the debt, the debtor had the legal right to sell it for such purpose, for he certainly could voluntarily do what the court, by suit, could legally compel him to do.
The creditor being a citizen of, and the land situated in, Kentucky, so far from its sale being interdicted, the *369 rights of the legal creditor are protected even against the government, on a proceeding to confiscate, by the 47th section of the act of Congress of March 3, 1863 (2 Brightly’s Digest, 1238).
That law that secured the right to the creditor to demand his debt, gave also necessarily the right to the debtor to pay it. The law that authorized the creditor and the court to sell the land to pay the debt, necessarily authorized the debtor to do so for the same purpose.
If the creditor had the legal right to demand the debt and the debtor had the right to pay it, his agent, friend, or trustee, would have the same legal right; and if both creditor and debtor had such right, any one, not under legal disabilities, had the right to purchase either for his own or the debtor’s benefit, subject, however, as urns all other property of the rebel debtor, to confiscation by the government, but not subject to be defeated in this or any other right by any one but the sovereign. The alien enemy, if the appellees be such, could legally hold the land against all the world but the sovereign and right of sale in his lawful creditors ; much more so could a rebel citizen of that sovereign; and legal rights and responsibilities might spring out of the conduct of a purchaser of his property, which, however, would remain suspended during hostilities, as the alien enemy or rebel citizen would have no such status as to authorize a suit by him in our courts. But, on the restoration of peace, his right of action would revive, and he could enforce any legal right which existed anterior to, or was created during, the war.
Wherefore, the judgment is affirmed, without damages, no supersedeas appearing in the case.