SUTHERLAND, ALIEN PROPERTY CUSTODIAN, v. MAYER ET AL.

MAYER v. SUTHERLAND, ALIEN PROPERTY CUSTODIAN, ET AL.

REIS ET AL. v. MAYER ET AL.

APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE FIRST CIRCUIT.

Nos. 232, 233, 234. Argued April 14, 1926.—Decided May 24, 1926.

1. The declaration of war, April 6, 1917, immediately effected dissolution of partnerships then existing between citizens of this country and citizens of Germany. P. 286.

2. During the war all intercourse, correspondence and traffic between citizens of the two countries which might advantage the enemy, was absolutely forbidden. *Id.*

3. The purpose of this restriction is not arbitrarily and unnecessarily to tie the hands of the individuals concerned, but to preclude the possibility of aid or comfort, direct or indirect, to the

opposing forces; and private rights and duties are affected only so far as they are incompatible with the rights of war. P. 287.

4. The rule that a liquidating partner must settle the partnership affairs within a reasonable time and, after payment of the partnership liabilities, divide the proceeds among the partners according to their interests, applies to a partnership between citizen and alien dissolved by war. P. 289.

5. As settlement is legally impossible until the close of the war, it is the right and duty of the respective partners to care for and preserve the assets of the partnership in their possession for their mutual benefit when the war is ended. *Id.*

6. A *post-bellum* accounting between such partners is controlled by equitable principles; and the American partner is not entitled, in virtue of his citizenship, to more favorable consideration in the court of equity than is accorded to his alien partner. P. 290.

7. Where the German assets of a German-American partnership, which was dissolved by the war, were cared for by the German partners during the period of non-intercourse, but lost much of their value owing solely to the great depreciation of the German currency, while the assets in possession of the American partner, by reason of the more fortunate state of American finances, had preserved their original monetary value, *held,* upon an accounting:

(1) That the failure of the German partners to liquidate the German assets, and their continued use of them in the business during the war, were not grounds for holding them as purchasers of the American's interest in such assets as of the date when war was declared, their conduct not having been hostile, nor inconsistent with an honest effort to administer the property to the best advantage of all concerned, and no loss having resulted from the continuance of the business. P. 290.

(2) That whether the accounting were taken upon the basis of what the German partners did with the assets after war was declared or of what they should have done, the loss was an ineluctable consequence of the war and must be borne by all the partners equally. *Clay* v. *Field,* 138 U. S. 464. P. 292.

(3) That the German partners should be charged with the American's share in the German assets at the exchange value of the German mark on July 14, 1919, the date of the War Trade Board regulation restoring the right of commercial intercourse between citizens of the two countries, when settlement of the partnership first became lawful, rather than at exchange value at the time of accounting. P. 295.

9542°—26——18

8. Where a partnership between citizens of two countries was dis- solved, and settlement suspended, by war, interest may be allowed to one partner in lieu of unascertainable profits derived from the assets by the other during the period of non-intercourse. P. 296.
9. Taxes levied by the German Government on the share of an American partner in partnership assets in Germany and paid by German partners during the war, *held* chargeable to him in a set- tlement of the partnership. P. 297.
10. An authority from an American partner to his German partners to make payments to his relatives from partnership funds, was canceled by the outbreak of war between the two countries. *Id.*
1 Fed. (2d) 419, reversed.

APPEALS from a decree of the Circuit Court of Appeals which affirmed in part and reversed in part a decree of the District Court, in a suit brought by the Alien Prop- erty Custodian for an accounting of assets, part in the United States and part in Germany, which appertained to a partnership existing on the declaration of war.

*Assistant Attorney General Letts,* with whom *Solicitor General Mitchell* and *Messrs. Dean Hill Stanley* and *E. N. Cherrington,* Special Assistants to the Attorney General, were on the brief, for Sutherland, Alien Property Cus- todian.

The court erred in adopting the par of exchange as the basis for determining in dollars the credits to which Mayer was entitled in respect of the assets located in Ger- many instead of using the rate of exchange existing at the time of proving the account.

The declaration of war did not alter the ownership of the partnership property in the respective countries. The instant war was declared, all intercourse between Mayer and his partners became illegal and, even though the war dissolved the partnership, it became legally im- possible to secure an accounting. *The Rapid,* 8 Cr. 155; *The Julia,* 8 Cr. 181; *United States* v. *Grossmayer,* 9 Wall. 72; *Habricht* v. *Alexander,* Fed. Cas. No. 5886; *Exposito* v. *Bowden,* 22 Eng. Rul. Cas. 399; *Robson* v. *Premier Co.*

*Ltd.,* (1915) 2 Ch. 124. Section 3 of the Trading with
the Enemy Act expressly prohibited such trading, thereby
adopting and broadening the common law rule. Account-
ing remained legally impossible after the General Enemy
Trade License of July 8, 1920, because that license ex-
pressly exempted from its operation any trade with re-
spect to property reported, or which should have been
reported, to the Alien Property Custodian. An account-
ing could not legally be had, therefore, until the state of
war ended and Congress so declared, on July 2, 1921.
But at that time, and until May 4, 1922, when the decree
after mandate was entered in *Mayer* v. *Garvan,* 270 Fed.
229, (aff'd. 278 Fed. 27,) Mayer was urgently pressing
before the District Court and before the Circuit Court of
Appeals his claim to all the American assets under a void
instrument.

It is well settled that mere dissolution, without an ac-
counting, has no effect upon the title to partnership
property. Dissolution by war does not free a party from
his duty to act in good faith with respect to the rights
of his partners. *Griswold* v. *Waddington,* 16 Johns. 438;
*Douglas* v. *United States,* 14 Ct. Cls. 1; *Cramer* v. *United
States,* 7 Ct. Cls. 302; *Stevenson & Sons, Ltd.* v. *Aktien-
gesellschaft, etc.,* (1918) A. C. 239. With respect to the
equitable ownership of partnership property after dis-
solution and before accounting, there is therefore noth-
ing peculiar to those cases where war produces the dis-
solution. The situation is governed by the familiar rules
as to dissolution by death or by operation of law gener-
ally. *Freeman* v. *Freeman,* 136 Mass. 260; *Moore* v.
*Huntington,* 17 Wall. 417; *Busch* v. *Clark,* 127 Mass.
111; *Case* v. *Abeel,* 1 Paige 393; *Evans* v. *Evans,* 9 Paige
178; *Wedderburn* v. *Wedderburn,* 22 Beav. 84.

The ownership of the partnership property was not,
prior to the accounting, altered by the acts of the parties.
There has been a gain regularly credited to Mayer's ac-

count in the partner's ledger. The only loss has been due to the depreciation in the German currency, which, of course, was not causally related to any act of the partners.

There is a striking analogy between this case and the *Clay Case*, 138 U. S. 464.

The conditions existing subsequent to April 6, 1917, and prior to the filing of the bill in this suit, rendered all losses to partnership assets, not due to the neglect or fault of any partner, a partnership loss. A partner's duty, after dissolution as before, is to observe absolute fairness and good faith toward his partners in dealing with partnership property. *Jones* v. *Dexter*, 130 Mass. 380; *Whitney* v. *Dewey*, 158 Fed. 385; *Betts* v. *June*, 51 N. Y. 274; *Beam* v. *Macomber*, 33 Mich. 127; *Lees* v. *LaForrest*, 14 Beav. 250; *Johnson's Appeal*, 115 Pa. 129. But he is under no liability to indemnify the firm from loss caused by an honest error in judgment. *Charlton* v. *Sloan*, 76 Iowa 288; *Knipe* v. *Livingston*, 209 Pa. 49; *Fordyce* v. *Shriver*, 115 Ill. 530.

The District Court and the Circuit Court of Appeals adopted the arbitrary "par of exchange" in translating into dollars what they respectively found to be due to Mayer in marks. It is submitted that there is no justification for the adoption of such a rule. Both the District Court and the Circuit Court of Appeals based their decision upon the authority of certain old cases which were characterized as "respectable authorities," principally *Adams* v. *Cordis*, 8 Pick. 260, and *Martin* v. *Franklin*, 4 Johns. 125. Long prior to the outbreak of war between the United States and Germany, the use of the par of exchange under circumstances such as the present had been largely abandoned by the courts and the prevailing rate of exchange generally adopted. *Grant* v. *Healey*, Fed. Cas. No. 5696; *Murphy* v. *Camac*, Fed. Cas. No. 9948; *Scott* v. *Hornsby*, 1 Call 35. See also *Hoppe* v. *Russo-Asiatic Bank*, 235 N. Y. 37; *Simonoff* v. *Bank*, 279

Ill. 248; *Katcher* v. *American Express Co.*, 94 N. J. L. 165; *S. S. " Celia"* v. *S. S. " Volturno"* (1921), L. R. 2 App. Cas. 544; *Di Ferdinando* v. *Simon, Smits & Co.* (1920), 3 K. B. D. 409; *Guiness* v. *Hicks*, 269 U. S. 71.

The court erred in crediting Mayer with the expenses incurred by him in connection with the suit of *Mayer* v. *Garvan,* 270 Fed. 229, aff'd. 278 Fed. 27. See *Grant* v. *Fletcher,* 283 Fed. 243.

A partner is not entitled to interest on capital which he contributes to the firm unless the partners have agreed that he shall have interest. *Hill.* v. *King,* 8 L. T. N. S. 220; *Cooke* v. *Benbow,* 68 Eng. Ch. 1; *Ewing* v. *Ewing,* L. R. 8 A. C. 822; *Hart* v. *Hart.* 117 Wis. 639; *Smith* v. *Smith,* 18 R. I. 722. And even where such an agreement exists, interest is not recoverable after dissolution of the firm unless there is a special stipulation to that effect. *Bradley* v. *Brigham,* 137 Mass. 545; *Johnson* v. *Hartshorne,* 52 N. Y. 173. It is the policy of courts in this country to require strict proof of such an agreement. *In re James,* 146 N. Y. 78; *Jones* v. *Jones,* 36 N. C. 332; *Daniels* v. *McCormick,* 87 Wis. 255. Interest is not allowed upon partnership accounts generally until after a balance has been struck on a settlement between the partners. *Miller* v. *Lord,* 11 Pick. 11; *Dexter* v. *Arnold,* 3 Mason 289; *Boddam* v. *Ryly,* 1 Bro. Ch. 239; *King* v. *Hamilton,* 16 Ill. 190; *Bayly* v. *Becnel,* 30 La. Ann. 75; *Smith* v. *Knight,* 88 Ia. 257.

Mayer is not entitled to interest as against the plaintiff. The United States is not liable for interest in the absence of express statutory provision therefor. *United States ex rel. Angarica* v. *Bayard,* 127 U. S. 251; *Gordon* v. *United States,* 7 Wall. 188; *United States* v. *Verdier,* 164 U. S. 213.

*Mr. Edward F. McClennen* for Richard Mayer.

The courts below erred in allowing nothing to Mayer for interest or loss of use of the property from the time

of its wrongful seizure in 1918 to the time of its return in 1922. The Alien Property Custodian wrongfully seized from the liquidating partner, Mayer, in 1918, property of the value of $916,939.66. Mayer was entitled at that time to have and retain from it as his own, $745,083.93. He demanded it back in 1918. He was wrongfully deprived of the use of that amount for four years. The final decree in *Mayer* v. *Garvan*, 278 Fed. 27, has established this as *res adjudicata*, between the Alien Property Custodian and Mayer.

As the claim is against this private fund and not against the United States or its officer as such, the rule of sovereign immunity from liability for interest has no bearing. *Miller* v. *Robertson*, 266 U. S. 243.

The Alien Property Law ought not to impose this loss on a loyal American citizen not required for the protection of the public interests, and going to benefit only the German partners who have had the actual use of the German share during all the time. *Stevenson & Sons, Ltd.* v. *Aktien-Gesellschaft*, 1918 A. C. 239; *Hicks* v. *Guinness*, 269 U. S. 71; *Clay* v. *Field*, 138 U. S. 464; *Hutchins* v. *Page*, 204 Mass. 284. This is not a claim for interest on balances properly in the hands of a liquidating partner.

The principle that, inasmuch as the enemy cannot lawfully pay the debt during the war, he is not liable for interest, does not apply to damages by way of interest on money or property withheld after demand which should have been complied with. *Hicks* v. *Guinness*, 269 U. S. 71; *Miller* v. *Robertson*, 266 U. S. 243; *Miller* v. *Humphrey*, 7 Fed. (2d) 330.

The Court of Appeals rightly held that Mayer was not obliged to account to the Alien Property Custodian for sums paid after April 6, 1917, by his former German partners, for German taxes on Mayer, individually. It is clear that one person cannot make another his debtor by paying, voluntarily, a tax on the latter without the

latter's request or consent. Even legitimate debts of a partner paid by the other partners without an agreement that they shall be a part of the partnership accounting, are not to be taken into account in determining the partner's share in the partnership assets.

Mayer was not obliged to account to the Custodian for sums paid without his continued authority, after April 6, 1917, by his former German partners to his relatives.

The Germans should be treated as purchasers April 6, 1917. It seems not to be disputed that they did not liquidate. They continued to use the German assets in a going business after the dissolution. The *Garvan* decree was based on the adjudged fact that the German partners had taken over the German assets as their own. That is *res adjudicata. Oklahoma* v. *Texas,* 256 U. S. 70; *Myers* v. *International Trust Co.,* 263 U. S. 64; *United States* v. *Moser,* 266 U. S. 236. Mayer did not and could not, before July 2, 1921, legally consent or contract with his enemy former partners that they might conduct a going business in Germany for his account.

The American assets had been liquidated in 1917. If the American assets had not been liquidated by Mayer's taking them to himself, and so becoming liable as a purchaser of them before the Alien Property Custodian took possession, they have not been liquidated yet, and he is not required to pay over any surplus until he has liquidated them and has satisfied his lien. The continuation of the German business for six years after April 6, 1917, rendered the Germans liable for the value of the German assets on April 6, 1917, irrespective of their intentions as to Mayer. When a partnership is dissolved, each of the partners has the right to have the partners in possession of the assets liquidate them immediately, and the consequent right, if liquidation does not take place within a reasonable time, to charge the partners in default with

the value of the assets. *Clay* v. *Field,* 138 U. S. 464; *Hutchins* v. *Page,* 204 Mass. 284; *Moore* v. *Rawson,* 185 Mass. 264. The value should be determined on the date of dissolution, April 6, 1917, *Parker* v. *Broadbent,* 134 Pa. St. 322; Lindley on Partnerships, 8th ed., p. 601. The representative of a deceased partner has the positive right to have the assets sold by the surviving partner, *Freeman* v. *Freeman,* 136 Mass. 260. If this right is ignored by the partner in possession, he is to be held liable for the value of the assets at the date of dissolution. *Stevenson & Sons, Ltd.* v. *Aktien-Gesellschaft,* 1918 A. C. 239.

The courts below rightly defined in English the German word mark used in a United States court. This case involves no question of foreign exchange, or of the date at which foreign exchange shall be reckoned. Upon the outbreak of war, there was no longer any rate of exchange. The internal value of the German mark in Germany on April 6, 1917, does not appear. The assets in Germany had to be valued. They were not marks. They were lands, buildings, plants, machinery, furniture, fixtures, tools, utensils, merchandise, receivables, bank balances in Switzerland, and cash. It was necessary to state the value of these. This value might have been stated in the English language, in the French language, in the Italian language, or in any other language. In fact, it was stated in a United States Court in the word marks. This made it necessary to define the word used, when used in that court. The word was in the dictionaries of the United States; " the monetary unit of the German Empire equivalent to 23.8 United States cents." There is no evidence that the dictionary definition, or that by the Director of the Mint, is erroneous. The finding of the courts below, that in the United States the German word " mark " is to be translated as 23.82 cents, was warranted by the evidence and not contrary to any evidence in the case.

This is not a case to ascertain the amount of damages for a breach or to obtain a judgment in dollars on a contract to make payment in marks. *Hicks* v. *Guinness*, 269 U. S. 71; *Birge-Forbes Co.* v. *Heye*, 251 U. S. 317.

*Mr. John W. Davis*, with whom *Mr. John Caldwell Myers* was on the brief, for Edwin Reis et al.

Dissolution does not create a debtor and creditor relationship among the partners. Story on Partnership (7th ed.), §§ 221, 325; *Crawshay* v. *Collins*, 15 Ves. 226; *Freeman* v. *Freeman*, 136 Mass. 260; Parsons on Partnerhip (4th ed.), § 286, p. 376; *Richardson* v. *Bank of England*, 4 Myl. & C. 165; *Arnold* v. *Arnold*, 90 N. Y. 580; *Lamalere* v. *Caze*, Fed. Cas. No. 8003; *Goldsboro* v. *McWilliams*, Fed. Cas. No. 5518; *Gommersall* v. *Gommersall*, 96 Mass. 60; *The Eumaeus*, 51 L. J. 7 (Adm. Ct.); 29 Harv. L. Rev. 795; *Anderson* v. *Allen*, 9 S. & R. 241; *Milliken* v. *Slote*, 1 Nev. 585; *Powell* v. *Railway Co.*, 36 Fed. 726.

No principle of partnership law is better settled than that interest does not run on a partner's distributive share until after a balance is struck on an accounting. The act of dissolution does not operate as a distribution or allocation of partnership assets. Some agent or agency—normally the surviving partners themselves or one designated by them as liquidating partner—must administer the assets and liabilities. *Moore* v. *Huntington*, 17 Wall. 417. And until this is done and an accounting had between the partners, and a balance struck on that accounting, the partnership property remains partnership property and may not become the individual property of any of the partners merely by conversion. Story on Partnership, § 351; *Cramer* v. *United States*, 7 Ct. Cls. 302; *Grant* v. *Fletcher*, 283 Fed. 243; *Zimmerman* v. *Harding*, 227 U. S. 489. During such period of administration the partnership entity—the estate in process of administra-

tion—may be committed to the tender mercies of a court of bankruptcy.. *In re Coe,* 157 Fed. 308; *In re Stein & Co.,* 127 Fed. 547.

The assets and liabilities of the partnership must be ascertained as of April 6, 1917, solely for the purpose of limiting Mayer's liability in a continuing business, but not to effect distribution or division of the partnership assets as of that date. There is no liability for failure to liquidate where there is no loss. And where the loss is not attributable to the fault or neglect of the partners who fail to liquidate but continue the business after dissolution, the loss must be borne by all the partners alike. *Clay* v. *Field,* 138 U. S. 464. Though intercourse between the enemy partners be prohibited on the outbreak of the war, and the partnership dissolved, the effect is no greater than that which occurs where a partnership is dissolved by mutual agreement of the partners. See *Buchanan* v. *Curry,* 19 Johns. 137; *Douglas* v. *United States,* 14 Ct. Cls. 1; *Cramer* v. *United States,* 7 Ct. Cls., 302; *Stevenson & Sons, Ltd.* v. *Aktiengesellschaft,* (1918) A. C. 239; *Clay* v. *Field,* 138 U. S. 464; *Griswold* v. *Waddington,* 16 Johns. 438; *United States* v. *Grossmayer,* 9 Wall. 72; *Insurance Co.* v. *Davis,* 95 U. S. 425.

No accounting and determination of the distributive shares of the partners could be had until the trial.

The account of the German partners shows that they have accounted for everything they received in the currency in which they received it. The loss which has been sustained by the partnership arises exclusively from the depreciation of that currency. *Jackson* v. *Chase,* 98 Mass. 286; *McNair* v. *Ragland,* 16 N. C. 520. The court erred in translating Mayer's distributive share computed in marks into dollars at the par of exchange (23.82 cents) for the purpose of rendering a decree in dollars. The par of exchange is an ideal, and whenever a currency becomes depreciated by either the issuance of debased me-

tallic coinage or paper money not representing gold or
silver in the treasury, the nominal or ideal par of ex-
change ceases to represent the true relation between the
currencies. In order to find equivalents, we must then
resort to the real par. See *Hargrave* v. *Creighton,* Fed.
Cas. No. 6064; *Robinson* v. *Hall,* 28 How. Prac. 342;
*United States* v. *American Gold Coin,* 24 Fed. Cas. 780;
*Martin* v. *Franklin,* 4 Johns. 124; *Adams* v. *Cordis,* 8
Pick. 260.

The World War has probably called to the attention of
the public generally, as emphatically as possible, the
principles of Gresham's law, and has developed a number
of decisions as to the rule to be applied in translating for-
eign currency into United States dollars. See *Hoppe* v.
*Russo-Asiatic Bank,* 235 N. Y. 37; *Simonoff* v. *Bank,* 279
Ill. 248; *Katcher* v. *American Express Co.,* 94 N. J. L.
165; *S. S. "Celia"* v. *S. S. "Volturno"* (1921) L. R. 2 App.
Cas. 544; *Di Ferdinando* v. *Simon, Smits & Co.* (1920),
3 K. B. D. 409; *Guinness* v. *Hicks,* 269 U. S. 71; *Birge
Forbes Co.* v. *Heye,* 251 U. S. 317. Wherever the court
has before it evidence as to the proper rate of exchange it
has applied that rate, whether the conversion be of marks,
*Miller* v. *Humphrey,* 7 Fed. (2d) 330, or francs, *The
Hurona,* 268 Fed. 910, *Page* v. *Levenson,* 281 Fed. 910,
*Dante* v. *Minnigio,* 298 Fed. 845, or florins, *Wichita Mill*
v. *Naamlooze,* 3 Fed. (2d) 931, or of pounds sterling, *The
Verdi,* 268 Fed. 908. See *Cramer* v. *Arthur,* 102 U. S.
612; *Grant* v. *Maxwell,* Fed. Cas. No. 5699.

The court erred in holding and ruling that the sum
set aside by the German defendants for reserves should
not be included among the liabilities, to the payment of
which the defendant Mayer's share should contribute.

The court erred in failing to hold that the claims of
Ely, Leiser, Sanft, and Heinstein for percentages of
profits of the firm constitute a liability of the firm, and
in failing to make provision in the decree for the pay-

ment of these liabilities, and in disallowing the sum paid by the German partners for taxes and the sum paid by them to Mayer's relatives, at his request.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

These are several appeals from a decree of the court below affirming in part and reversing in part a decree of the federal district court for the District of Massachusetts. The suit was brought by the Alien Property Custodian against Richard Mayer, a naturalized citizen of the United States, two corporations, organized under Massachusetts law, Karl B. Strauss, a naturalized subject of Great Britain, and Edwin Reis and Anny Reis, in her own right as widow and as trustee for two minor children of Ludwig Reis, deceased, citizens and inhabitants of Germany, for an accounting in respect of the interest of Mayer and the German citizens in certain assets in the United States in Mayer's possession and assets in Germany in the possession of the Germans, alleged to belong to a partnership consisting of Mayer, Edwin Reis, Karl B. Strauss and Ludwig Reis.

The partnership was formed sometime prior to the declaration of war against Germany on April 6, 1917, and was existing at that time. Mayer contributed to the partnership his American business, worth slightly over 206,000 marks—less than $50,000. The German partners contributed about 2,655,000 marks. By the partnership agreement, after payment of 4½ per cent. on the capital contributed and stipulated salaries, Mayer was to receive 20 per cent. of the profits, to be credited to his capital account. The partnership agreement was made in Germany, and the principal seat of the partnership was at Friedrichsfeld, Germany, with branches at Manchester, England, and in Boston. At the time of the declaration

of war, the partnership assets in Mayer's possession had grown to a little over $910,000, and his share in the European assets amounted to 2,414,056.12 marks. Of the amount in Mayer's possession, between $500,000 and $600,000 consisted of a balance remaining out of $2,500,000 sent to him by the German partners for the purpose of buying cotton waste.

After the declaration of war, the American assets were seized by the Alien Property Custodian; but in a suit brought against that officer they were ordered redelivered to Mayer upon the ground that he had a lien upon them for his share of the partnership capital and profits. *Mayer* v. *Garvan*, 270 Fed. 229, affirmed 278 Fed. 27. The value of the assets returned to Mayer was $828,072.72, losses having occurred which are not material to the present consideration.

In that case the court held that under the partnership agreement Mayer was entitled upon distribution to have out of the assets of the partnership the amount of his capital investment together with 20% of the net profits earned by the partnership, and was liable for 20% of all losses. There was, however, no evidence of the actual value of the American property or of the German or English property, nor of the liabilities of the firm; and this suit for an accounting followed. It is not disputed that the custodian is entitled to the American assets after deducting therefrom the amount of Mayer's share in all the assets.

The German partners entered an appearance in the present suit and produced at the hearing all the account books. The property in Manchester had been seized by the English Government and sold, leaving debts on account of the English branch, amounting to £35,000, which were either paid or assumed by the German partners. The district court found that a few days prior to the declaration of war the value of the German mark in the

currency of the United States, according to the rate of exchange then quoted, was about 18 cents. Thereafter, no rate of exchange was quoted until July 17, 1919, at which time the exchange value of the German mark was 7⅞ cents. Thereafter, its value steadily declined, until at the time of the Act of Congress declaring the state of war at an end on July 2, 1921, it was 1.35 cents; and when the hearing was begun in the present case its value was .0048 of a dollar. The district court determined that the German partners should account for Mayer's share of the German assets at their value on April 6, 1917, the American assets to be measured in terms of the American gold dollar, and the German assets correspondingly in terms of the German gold mark, which is the equivalent of 23.82 cents of the money of the United States; and upon this basis the decree was entered. The circuit court of appeals, in affirming the decree, adopted the same view. *Sub nom. Miller* v. *Mayer,* 1 Fed. (2d) 419. And this presents the principal question in the case and the only one requiring extended consideration.

Appellants in Nos. 232 and 234 unite in the contention that the declaration of war did not affect the title to the partnership property; that although the partnership was thereby dissolved the partners must suffer ratably from any depreciation in the value of the German assets after the dissolution and before the accounting; and that the accounting must be made upon the basis of the value of such assets at the time of the accounting, the value of the mark being taken at its then rate of exchange.

That the declaration of a state of war immediately effected a dissolution of the partnership is well settled and is not in dispute. It is likewise settled that during the war all intercourse, correspondence and traffic between citizens of this country and of Germany, which would or might be to the advantage of the enemy, were absolutely forbidden. *Conrad* v. *Waples,* 96 U. S. 279, 287; *Briggs*

v. *United States,* 143 U. S. 346, 353.   The effect of War
Trade Regulations No. 802, July 14, 1919, and No. 814,
July 20, 1919, we shall consider further along.

The reasons for, and the limitations upon, the rule have
been frequently stated.   War between nations is war be-
tween their individual citizens.   All intercourse incon-
sistent with a condition of hostility is interdicted, *The
Rapid,* 8 Cr. 155, 162–163, for fear that it may give aid or
comfort to, or add to the resources of, the enemy.   More-
over, as said by this court in *United States* v. *Lane,* 8 Wall.
185, 195, "If commercial intercourse were allowable, it
would oftentimes be used as a color for intercourse of an
entirely different character; and in such a case the mis-
chievous consequences that would ensue can be readily
foreseen."   But war is abnormal and exceptional; and,
while the supreme necessities which it imposes require
that, in many respects, the rules which govern the rela-
tions of the respective citizens of the belligerent powers
in time of peace must be modified or entirely put aside,
there is no tendency in our day at least to extend them
to results clearly beyond the need and the duration of
the need.   The purpose of the restriction is not arbitrarily
and unnecessarily to tie the hands of the individuals con-
cerned, but to preclude the possibility of aid or comfort,
direct or indirect, to the opposing forces.   It is that pur-
pose which gives birth to the rule and indicates its limits.
The rule is simply " a belligerent's weapon of self-protec-
tion."   *Daimler Co.* v. *Continental Tyre, etc., Co.,*
[1916] 2 A. C. 307, 344.   And it applies even where the
trading is with a loyal citizen, if he be resident in the
enemy's country, since the result of his action may be to
furnish resources to the enemy.   *Id.,* 319; *Janson* v. *Drie-
fontein Consolidated Mines,* [1902] A. C. 484, 505.   The
whole tendency of modern law and practice is to soften the
" ancient severities of war," and to recognize, increasingly,

that the normal interrelations of the citizens of the respective belligerents are not to be interfered with when such interference is unnecessary to the successful prosecution of the war. Private rights and duties are affected by war only so far as they are incompatible with the rights of war. See, generally, *Kershaw* v. *Kelsey*, 100 Mass. 561, 568–574, where the question is elaborately reviewed in an opinion by Mr. Justice Gray which has several times received the approval of this court; *Briggs* v. *United States, supra*, p. 353; *Williams* v. *Paine*, 169 U. S. 55, 72; *Birge-Forbes Co.* v. *Heye*, 251 U. S. 317, 323.

Thus, where a contract has been performed before the advent of war and nothing remains but the payment of money, the right to collect is not destroyed, but only the remedy suspended until the termination of the war. *Hanger* v. *Abbott*, 6 Wall. 532, 537; *Brown* v. *United States*, 8 Cranch 110, 123; *New York Life Ins. Co.* v. *Statham*, 93 U. S. 24, 31; *Crutcher* v. *Hord and wife*, 67 Ky. 360, 366; *Mutual Benefit Life Ins. Co.* v. *Hillyard*, 37 N. J. L. 444, 465. Agencies, created before the war, and not requiring intercourse across the enemy's frontier, such as for the collection of debts, preservation of property, and so forth, are not terminated by war. See, generally, *Ward* v. *Smith*, 7 Wall. 447, 452–453; *Quigley's Case*, 13 Ct. Cl. 367, 371; *Anderson* v. *Bank*, 1 Fed. Cases 838, No. 354; *Lamar* v. *Micou*, 112 U. S. 452, 464. And in the case of contracts made before the war for the delivery of goods, it is entirely lawful to make delivery during the war within the United States. The thing forbidden is placing property or money within the power of the enemy, "not in delivering it to an alien enemy, or his agent, *residing here*, under the control of our own government. . . . In such a case, the interests of commerce are perfectly compatible with the rights of war; and public policy does not forbid the transfer." *Buchanan* v. *Curry*, 19 Johns. 137, 141.

And so here, we have to deal not with a contract made during the war or requiring commerical or other inter-

course across military lines, but with an adjustment of
rights, after the restoration of peace, under lawful articles
of partnership entered into before, and existing at the out-
break of, the war.  The advent of a state of war put an
end to the partnership and postponed all remedies relat-
ing to the dissolution; but it. did not petrify rights and
duties resulting therefrom.  Its effect only was to suspend
the enforcement of the obligation of each of the partners
in respect of the assets and past transactions of the part-
nership; and the essential inquiry now is: What was the
obligation which resulted from the dissolution?

Upon the dissolution of a partnership, the general rule
is that the liquidating partner or partners must settle up
the partnership affairs within a reasonable time and,
after payment of the partnership debts and liabilities,
divide the proceeds among the partners according to their
interests.  *Clay* v. *Field,* 138 U. S. 464, 473.  The rule is
not different because the dissolution is the result of war.
*Stevenson & Sons* v. *Aktiengesellschaft, etc.;* [1918] A. C.
239, 246.  But in the case of such a dissolution, in the
absence of legislation to the contrary, a settlement is
legally impossible until the close of the war, because of
the rule forbidding intercourse across the enemy's fron-
tier and denying access by enemy citizens to our courts;
although it is entirely compatible with the rule to recog-
nize the right and duty of the enemy partners to care for
and preserve the assets of the co-partnership in the pos-
session of each for their mutual benefit when the war has
ended.  To say otherwise, because an enemy may realize
a benefit after the war has come to an end, is utterly to
misapply the principle upon which the non-intercourse
rule is based and to confound the suspension of the rem-
edy with the loss of the right.  " The prohibition against
doing anything for the benefit of an enemy contemplates
his benefit during the war and not the possible advantage
he may gain when peace comes."  *Daimler Co.* v. *Conti-*

*nental Tyre, etc. Co., supra,* p. 347; *Stevenson & Sons* v. *Aktiengesellschaft, etc., supra,* pp. 249, 253, 254.

In the present case, the adjustment of the account as among the partners is a matter in which the government—the war and the exigencies of the war having passed—is no longer concerned, save as its rights and duties are represented by the Alien Property Custodian. Except for the latter consideration, we are dealing with a simple suit for an accounting among partners, to be determined by the application of equitable principles. *Stevenson & Sons* v. *Aktiengesellschaft, etc., supra,* p. 248. The effect upon these principles of the dissolution of the partnership by war is certainly no greater than if it had been dissolved by death or agreement. *Buchanan* v. *Curry, supra,* pp. 142–143. In either event the relation created by the dissolution in respect of the assets is a fiduciary relation, and adjustments of rights and liabilities of the partners *inter se* are to be made in accordance with the rules governing such relationships; and in a court of equity the American partner, *ipso facto,* has no such exceptional privilege as will permit him to secure more favorable consideration than that to be accorded to his alien partners.

The argument for Mayer is that the German partners should be treated as having purchased the German assets on April 6, 1917, and compelled to account for Mayer's interest therein upon that basis and as of that date. In support of that contention we are referred to the record in the original case of *Mayer* v. *Garvan, supra,* of which the district court in the present case took judicial notice. That record has not been before us; but we accept the statements contained in Mayer's brief in respect of its disclosures, since they do not seem to be challenged by the other parties. We are of opinion, however, that they fall short of establishing a situation for applying the theory of a purchase of the German assets by the German partners.

Undoubtedly, the German partners, instead of liquidating, continued to use the assets after the dissolution in a going business, commingling old assets with new. Also, they took in a new partner. The court of appeals said, and evidence is quoted from the Garvan record to the effect, that the assets were taken over by the German partners and thereafter treated as their own. The evidence before us in the present record is to the effect that the business in Germany was carried on during the war as it had been before; that Mayer's share of the profits was credited to him annually in the private ledger at Friedrichsfeld; and that a sum sufficient to pay out Mayer's capital interest, as shown by the books, was continuously carried on deposit in banks.

Precisely what are the facts in respect of this matter we need not stop to determine, because, in view of the conclusion we have reached, it is not material whether the German partners treated the business as their own or as that of the old partnership. The partnership was at an end; and their duty was to liquidate. They could not carry on the business in any form so as to bind Mayer. But Mayer must elect either to accept what was actually done, with the burdens and benefits, or to enforce against his German partners a liability based upon what they should have done. The decision below and Mayer's attitude apparently proceed upon the latter alternative, and in that view, in an ordinary case, he could justly be given no more than what he would have obtained if the liquidation had in fact been made within a reasonable time and the amount of his share promptly paid over to him. Precisely at this point, the contention in Mayer's behalf breaks down, for it ignores the circumstance, which differentiates this from the ordinary case, that, even if the assets had been promptly liquidated, nothing could have been paid to Mayer until after the removal or expiration of the non-intercourse bar. Until that time, the amount

coming to Mayer necessarily would have been held by the German partners in the form of German currency, or of securities or a bank account payable in such currency, and the loss, so far as Mayer is concerned, would have resulted none the less.

In this connection the fact may not be disregarded that the German partners dealt with a situation under the abnormal restraints and perplexities of war; and it is fair to interpret what they did in the light of that situation. So viewed, we are unable to conclude that their acts were hostile to Mayer's ultimate rights or inconsistent with an honest effort to do the best possible thing with the property until the close of the war, utilizing it, in the meantime, in a way which they conceived to be to the best advantage of all concerned. It is clear that no loss was sustained by the continuance of the business; but, on the contrary, there was an asset gain. The great loss, which finally resulted, and which was little short of being complete, was due entirely to the depreciation in the value of the German mark and not to any lack of care or good faith on their part. Moreover, with the exception of plant and machinery, relatively of small value, the German assets during the entire time were in the form of German paper currency or securities, bills receivable, etc., convertible only into German paper currency, since there was no gold in circulation and the paper currency was by German law legal tender.

In whatever aspect the case is viewed or upon whatever basis the liability of the German partners be made to rest, the loss, in the final analysis, was an ineluctable consequence of the war. Is it to be borne by them alone or to be shared equally by all the partners as a common misfortune beyond the power of any of them to turn aside? That question justly cannot be solved by a strict enforcement of the ordinary rule as in ordinary cases, for here we are dealing with extraordinary and anoma-

lous conditions, as a result of which money values were swept away by immense causes as much beyond the sway of the German partners as of Mayer. Blame for such a situation rests upon neither; and equality is equity.

This would appear more clearly if there were no American assets and the German assets were alone concerned. In that event, a decree compelling the German partners to account to Mayer upon the basis of the full value of these assets at the outbreak of the war in terms of gold, notwithstanding the destructive force of these unavoidable circumstances, would be so obviously harsh and inequitable as to shock the conscience of the chancellor. But the equities are not different because Mayer chances also to have in his possession partnership assets—the greater part of which, it may be said in passing, had been sent to him by the German partners for trade purposes—which, by reason of the more fortunate state of American finances, had preserved their original monetary value.

Upon the whole, we think the case is fairly ruled in principle by *Clay* v. *Field, supra.* In that case, the property of the partnership consisted of a plantation in Tennessee. Prior to the outbreak of the Civil War, one of the partners died. The surviving partner continued, after his partner's death, to retain possession of the plantation, together with the slaves upon it, and to operate the property in good faith. When the war came a year or two later, the plantation was in the theatre of conflict, and at the close of the war the slaves had become free. The court recognized the general rule, as we have already stated it, that it was the survivor's duty to settle up the partnership affairs within a reasonable time and pay over to the representatives of the deceased partner the amount due them. And the court proceeded to say (pp. 473–474) that " if he [the survivor] takes the responsibility of continuing the business of the firm, and using the property

of the partnership, he becomes liable for losses that may occur, and it is in the option of the representatives of the deceased partner either to insist upon a division of the profits, which may be made in thus carrying on the business, or upon being paid the amount of the deceased's share in the capital, with lawful interest thereon, after deducting his indebtedness to the firm." Strictly applied, the court said, the rule would entitle the representatives to call for an account of the share of the deceased at the time of his death with lawful interest. But, in view of the anomalous circumstances and unexpected events, the court declined to enforce the rule, saying (p. 474): " In our view, equity, when called upon to settle the mutual rights of the parties, may very properly mitigate the hardships of the rule, especially when, as in this case, the loss has occurred by public war." It was recognized that the survivor " might have sold the slaves and other property on terms which, in the light of subsequent events, would have been greatly to the advantage of his brother's estate, yet it seems clear from the evidence that the reason he did not sell was that no opportunity offered of effecting a sale of the plantation at what he deemed an adequate price." Under all the circumstances, this court agreed with the trial court that it would be a very hard application of the general rule relating to a dissolution of partnership to compel the survivor or his estate to account for the value of the slaves, which, in a short time, were freed by operation of law and no longer articles of property. It was, therefore, held that the surviving partner was not accountable for the value of the slaves, but was accountable for the fair rental value of the property, including that of the slaves while they were slaves. See also, *Tate* v. *Norton*, 94 U. S. 746, 747–748.

Here the case for the German partners, if anything, is stronger; for, during the non-intercourse period, there never was a time when, so far as appears, Mayer's share

could have been converted into anything but German marks, or when it was legally possible to pay the amount to Mayer. As soon as the non-intercourse restriction ceased to be operative, however, such payment became lawful, and an obligation arose on the part of the German partners to make it, since Mayer's share, long prior to that time, had been identified and was separable from the body of the assets. It was, in effect, a trust fund, in respect of which the German partners then owed the duty of prompt settlement. The war was formally declared to be at an end by the Act of July 2, 1921; but the right of commercial intercourse and of communication between citizens of this country and Germany was restored by the War Trade Board regulation of July 14, 1919, as amended July 20, 1919. We, therefore, conclude that the German partners should be charged with the amount of Mayer's share of the German assets at the exchange value of the German mark on July 14, 1919. The evidence in the record shows that on July 17th, three days later, the exchange value was 7⅞ cents, which seems near enough to the designated date. The depreciation of the German mark was so great that to compute its American monetary value on a nominal par basis would be to indulge in a pure fiction; and exchange values must be resorted to as the only available method of measurement. The conclusion that the exchange value of marks in American money is to be taken as of the time when commercial intercourse, and, therefore, settlement, first became lawful, rather than at the time of the accounting, finds support, by analogy, in many decisions. See, for example, *Hicks* v. *Guinness*, 269 U. S. 71, 80; *S. S. Celia* v. *S. S. Volturno*, [1921] 2 A. C. 544; *In re British American Continental Bank*, [1922] 2 Ch. 575; *Société des Hotels* v. *Cumming*, [1921] 3 K. B. 459; *Di Ferdinando* v. *Simon, Smits & Co.*, [1920] 3 K. B. 409; *Lebeaupin* v. *Crispin*, [1920] 2 K. B. 714.

In fixing the date upon which exchange should be calculated, the inevitable delay which must result before a

judicial taking of the account must be given weight. If the liability be treated as having crystallized at the time indicated above, then a definite date is fixed for the ascertainment of exchange and the amount when found may be awarded without regard to the fluctuations in the possible date of accounting. *Lebeaupin* v. *Crispin, supra,* p. 723. In England the rule has been applied in a winding-up proceeding upon the ground that a date must necessarily be fixed on which liabilities are to be treated as definitely ascertained for the purpose of properly conducting the later winding-up of the company's affairs. *In re British American Continental Bank, supra,* p. 582. And the rule is the same whether the contract is to be performed in England or out of England, on the ground that there should not be varying rules in such cases. *Lebeaupin* v. *Crispin, supra,* p. 723.

The remaining questions in dispute require only brief consideration.

The district court held that it was impossible to calculate the profits which should be equitably assigned to Mayer's share in the German assets, and that, since there could be no payment to him during the period of nonintercourse, interest could not be allowed him upon such share,—applying the rule laid down in *Brown* v. *Hiatts,* 15 Wall. 177. But the question there arose in respect of a debt which became payable during the progress of the Civil War, and the court held that, since the debt could not be paid until the termination of the war, interest upon it could not be exacted. Here we are not dealing with the question of interest upon a debt, or really with interest at all except as a term of convenience; but with that of an allowance in lieu of unascertainable profits, to which the rule in the *Hiatts Case* has no application. *Stevenson & Sons* v. *Aktiengesellschaft, etc., supra,* p. 256. An award should have been made to Mayer calculated upon the basis of interest in lieu of profits.

The district court allowed the German partners a credit for 266,432.40 marks paid by them to the German Government during the war for taxes levied against Mayer's partnership interest in 1914, 1915 and 1916. It appears that, if the tax had not been paid, Mayer's share would have been liable to seizure by the tax collector. The circuit court of appeals reversed the ruling of the district court and disallowed the item. The obligation was one which apparently arose before the war, and, in the view we have taken of the relation of the German partners to Mayer's interest in the assets, we think the payment was properly made to protect the fund and that the district court was right in allowing credit for it.

Payments made during the war to relatives of Mayer do not rest upon like considerations; and we agree with the action of the circuit court of appeals in disallowing them. These payments were based upon directions, said to be of a continuing character, given before the war; but which were brought to an end by the advent of war. This results not on the ground that the payments were contrary to public policy, but upon the ground that the outbreak of hostilities produced such a fundamental alteration in the relations of the parties that we cannot assume a continuance of authority to make such payments in the absence of evidence of Mayer's assent thereto. *Insurance Co.* v. *Davis,* 95 U. S. 425, 429; *Williams* v. *Paine, supra,* p. 73.

In respect of other items, either allowed Mayer or disallowed the German partners, we see no reason to differ with the conclusions of the circuit court of appeals.

*Decree reversed.*