INTERNATIONAL SILK GUILD, Inc., a New York Corporation, Plaintiff,

v.

Herbert BROWNELL, as Attorney General of the United States, as successor to the Alien Property Custodian, and Ivy Baker Priest, Treasurer of the United States, Defendants.

Civ. A. No. 3403–51.

United States District Court
District of Columbia.
March 29, 1957.

546

Delmar W. Holloman, Washington, D. C., Arthur J. Cerra, J. Lee Murphy and Davies, Richberg, Tydings & Landa, Washington, D. C., of counsel, for plaintiff.

Dallas S. Townsend, Asst. Atty. Gen., James D. Hill, Walter T. Nolte and Daniel G. McGrath, Attys., Dept. of Justice, Washington, D. C., for defendants.

MORRIS, District Judge.

In the opinion filed by this Court June 27, 1952, 105 F.Supp. 766, in this proceeding (brought under Section 34(e) of the Trading with the Enemy Act, as amended, 50 U.S.C.A.Appendix, § 34(e), for a review of the action of the Director of the Office of Alien Property denying plaintiff's claim against funds of Asahi Silk Company, a Japanese corporation, vested under the provisions of the Act), I stated that, notwithstanding the absence of proof of an agreement between the parties that assessments paid by importers in this country to exporters of silk in Japan that the exporters would remit such monies to the plaintiff, "I would conclude that the claim should be allowed in view of the purpose and understanding on the part of the importers at the time the money was paid and received by the exporters, including Asahi, Japan, with the knowledge of such purpose and understanding on the part of the importers paying the funds, if it were shown that such funds were in the hands of the exporters, in the instant case in the hands of Asahi, Japan, at the time of the vesting of that exporter's property in the Alien Property Custodian. To conclude otherwise would be to sanction an unjust enrichment contrary to the law of the State of New York, which is the critical law here applicable." Without such showing, summary judgment was granted to the defendants on July 8, 1952.

Pursuant to motion filed by plaintiff July 17, 1952, order of this Court was filed April 13, 1953, in which the previous order and judgment of the Court was vacated and set aside and the proceedings reopened to receive into the record newly discovered evidence. At the suggestion of the Court that the administrative agency might wish to reconsider the matter in the light of the newly discovered evidence, and the record in this case, pursuant to order of the Court, having been turned over to the custody of the Director of the Office of Alien Property, Department of Justice, the Director ordered January 12, 1954, "that the claim be reopened * * * for the purpose of reconsidering such evidence as the parties may adduce with respect to the issue whether Asahi Silk Company, Ltd., Japan, had in its possession on October 31, 1942, the effective date of Vesting Order No. 283, funds claimed by the claimant, and for such disposition as said evidence may warrant." On January 31, 1956, the Deputy Director, Office of Alien Property, issued a decision, stating:

"After a thorough consideration of the entire record, including the new evidence, I find that there is no sound basis, in law or in fact, for the Guild's claim that Asahi, Japan, ever became indebted to it in the amount alleged or in any amount. Accordingly, the claim is again disallowed."

Following that decision, and leave of this Court therefor, plaintiff filed a supplemental complaint for review, and each of the parties filed motions for summary

judgment, upon which arguments were had and briefs filed.

The new evidence disclosed, and the defendants concede, that Asahi, Japan, was in possession of ¥80,323.09 on October 31, 1942, the date of vesting of its property in the Alien Property Custodian, and the balance of the funds collected by Asahi, Japan, were held by the special committee, through which the funds were to be remitted to the plaintiff. Also among the new evidence were affidavits of Takuichi Wakimoto and of Yujiro Nishimoto.

From 1933 to 1936 plaintiff was supported by monies collected from the exporters and other dealers in the silk industry in Japan, which were sent to it by the Central Raw Silk Association of Japan, but was advised toward the end of 1935 that such contributions would be discontinued. In an effort to create a source of income, plaintiff proposed to the importers in the United States (a considerable number of which were Japanese representatives of the exporters) that they pay the extra charge, or assessment, on all silk purchased, and it was decided that an accurate collection thereof could better be assured by the exporters by simply adding the assessment charge to all purchases on invoices therefor, the exporters to remit the funds thus collected to the Guild. The assessments were collected by the exporters and remitted to the special committee of the Central Raw Silk Association through the Yokohama and Kobe Silk Exporters Associations, and were sent to the Guild with substantial regularity (though considerable prodding on the part of the Guild became necessary as early as September 1937) until May 1940, and from May 1940 to July 1941 only one remittance was received. Remittances after June 14, 1941, became impossible because of the imposition on that date of freezing controls preventing any foreign exchange transaction between the parties. There is no substantial evidence in the record to substantiate a finding that the Guild,

the importers and the exporters did not agree to this method of furnishing income for a continuation of the work of the Guild, which was beneficial to all; nor is there substantial evidence to support a finding that Asahi, Japan, was not indebted to the Guild for the monies thus collected by it, and in its hands at the time of the vesting of its property by the Alien Property Custodian.

The question as to whether recovery can be had of the monies held on the date of vesting by the special committee is a more difficult one. I do not think it was contemplated by any of the parties that any of the monies collected through this plan, except some small portion for operational cost in Japan, would not be remitted to the Guild, and it is unthinkable that the United States importers would have furnished the monies for any other purpose, but it admittedly was obvious to all that their plan and purposes would have to yield to the intricacies of the Japanese Government in so far as necessary to accomplish the remittances from that country to the United States. The following is an excerpt from the minutes of a meeting of the Executive Committee of the Guild on November 29, 1938:

"The President then read in full the translation which had been furnished the Guild of the resolution adopted by the Raw Silk Export Associations of Yokohama and Kobe and affirmed by the Central Raw Silk Association of Japan at its Seventh Special Meeting held June 22, 1936, calling the Committee's particular attention to subparagraph B of paragraph 3, reading as follows:

"That, the Central Raw Silk Association of Japan shall form a special committee which shall be entrusted with the power to outline the policy on the promotion and method of spending the fund. The Committee shall be comprised of five persons, in order to maintain a minimum number:—the Vice-President of the Central Raw Silk Association

of Japan, and another member of the same Association, and three representatives of the Exporters."

It is insisted by the plaintiff that this special committee was controlled by the exporters, and Mr. Wakimoto stated in his affidavit that this purpose of the exporters was accomplished by having exporters constitute a majority of its membership, and doubtless this was their hope. Cross-examination of Mr. Paolino Gerli, president from its organization of the Guild, developed the following testimony:

"I believe I have already testified that the method which the Japanese exporters adopted in Japan for the remittances to us was something over which I had no control and which I did not pretend to advise them on, because we were in a foreign country and I didn't know what the rules and regulations were, and it was entirely up to them to devise their own assessment.

\*　\*　\*　\*　\*　\*

"And so we had to help them in Japan, the ones here would come and say, 'Please be reasonable, you got to do those things and you got to cooperate otherwise you won't get to first base on these things,' and of course we tried to be suppliant and we had to do and did a lot of these things they requested us to do."

The minutes of the meeting on November 29, 1938, reflected the president's satisfaction of the resolution of the special committee, and it was voted at the meeting to suggest to the special committee its adoption of a resolution declaring that, under the authority conferred upon it by the resolution which created it, it would as a matter of policy and method, forward to the Guild regularly in dollars monthly the amount of assessments collected in Japan upon the raw silk exported to the United States during each preceding month, except in the event of action by the Japanese Government with respect to the exportation of money from Japan generally which rendered such remittances impossible. On August 18, 1939, the special committee adopted and forwarded to the Guild the following resolution:

"\* .\* \*, the special committee states that it has in the past remitted to the International Silk Guild for the Guild use in promoting Silk in the U. S. the approximate amount of the assessments collected upon the raw silk exported to the U. S. and that, in so far as it lies within its power, it is its intention to continue to do so."

Undoubtedly, in addition to the difficulties inherent in the accomplishment of the remittances from Japan under its then form of government, there was some misunderstanding on the part of the special committee, or a usurpation of prerogatives by it. In 1938 the Central Raw Silk Association of Japan appropriated ¥300,000 and bound itself for a lesser sum for 1939 to maintain exhibits at the World's Fairs in New York and San Francisco without the knowledge or consent of the Guild. This action was condemned and protested by the Guild, and a letter from the President of the Association to the President of the Guild stated:

"We exceedingly regret that we have taken a step to participate in the Fairs without having previously consulted with you, but as explained, the circumstance in which we were shrouded compelled us to make a quick commitment. It is hoped that you would be so good as to ignore whatever formality is lacking on our part."

According to a report of the military authorities in Japan and a translation of a summary of the actions and financial records of the Central Raw Silk Association forwarded by those authorities, the Association allocated in its budgets considerably less than the anticipated assessments for payment to the Guild, and at times paid even less than allocated, and allocated and paid fairly substantial amounts from such funds to a French organization. This document was said by the Hearing Examiner to be "of value because of the accounts

and records of the associations quoted and statements of fact concerning them," but "the inference and conclusions contained therein are of doubtful value as evidently the conclusions of a Japanese silk representative defending his industry against a claim." In this connection, the Wakimoto affidavit states:

"That, likewise, affiant was apprised of the investigation conducted in 1948 by representatives of the Japanese Government at the direction of the Supreme Commander Allied Powers (SCAP) which resulted in a report to the Office of Alien Property in the United States allegedly relating to the claims of the Guild against the vested assets of said exporting firms.

"That, in the course of said investigation, former representatives of each of the said exporting firms, including affiant, were advised by one of the representatives of the Japanese Government conducting the investigation that it might be better for them to indicate their denial of any obligation to the Guild to elimate any complications in the future but, if they considered it better not to do so or a matter of policy in the interest of the silk industry as a whole, it was entirely up to them; and affiant knows of his own knowledge that the report of those conducting said investigation was transmitted to SCAP without examination by or the approval of the exporters."

I would agree with the Hearing Examiner in according very little weight to the evidentiary value of the document, but in this proceeding I cannot substitute my judgment for that of the Deputy Director, Office of Alien Property, who relied upon this document. In any event, the Guild at no time ever attempted to hold the individual exporters responsible for monies they had remitted to the special committee, but always insisted that the special committee had only the administrative duty of transferring the monies to it, and accepted the remittances of the exporters as a performance of their part of the agreement. Proof is lacking that the exporters were able to exercise the control over the special committee which would simply constitute it their agent so as to make the monies held by the special committee at the time of the vesting of the property of Asahi, Japan, the monies of the exporters, in this instance Asahi, Japan.

For the reasons stated, summary judgment will be granted to the plaintiff for the value of ¥80,323.09. These funds were returned to Asahi, Japan, on September 22 and 25, 1942, thus fixing its liability as of those dates, which were subsequent to the freezing controls. Remittance to the Guild thereafter was not possible until relations with Japan were restored on December 31, 1946, by amendments to General License 94 and to Public Circular No. 25 (12 Fed.Reg. 1457, 1459, March 4 1947). There was, however, no rate of exchange on that date, and exhibits filed in the case show that, pursuant to a directive on April 25, 1949, of the Supreme Commander for the Allied Powers, the Japanese government promulgated a foreign exchange and foreign trade control law, effective as of December 5, 1949, and designated two New York City banks to handle foreign exchange transactions. Under the principles stated in the case of Southerland v. Mayer, 271 U.S. 272, 46 S.Ct. 538, 70 L.Ed. 943, it is the exchange rate effective on this latter date (the first after Asahi, Japan, became liable for payment of the ¥80,323.09) to which the plaintiff is entitled. According to a letter dated January 17, 1950, from the Treasury Department, Office of International Finance, to the Office of Alien Property, Department of Justice, also filed as an exhibit herein, such rate of exchange is ¥361.55 to the dollar. Summary judgment will be granted to the defendants respecting the balance of the claim, which is dependent upon the monies held by the special committee.

Counsel will prepare an appropriate order to carry this decision into effect.