## TATE *v.* NORTON.

1. In Arkansas, the real as well as the personal estate of the intestate is assets in the hands of an administrator; but neither species of property can be sold without an order of the Probate Court.

2. A claim admitted by the administrator, and allowed and classified by the Probate Court, has the dignity and effect of a judgment.

8. There can be no *devastavit* which will sustain an action against an administrator until he has violated an order of the Probate Court to pay creditors; and his accounts settled by that court cannot be collaterally attacked, but are conclusive, until, by a direct proceeding in equity instituted for that purpose, they are impeached for fraud or mistake.

APPEAL from the Circuit Court of the United States for the Eastern District of Arkansas.

The facts are stated in the opinion of the court.

Submitted on printed arguments by *Mr. W. M. Rose* and *Mr. A. H. Garland* for the appellants, and by *Mr. Albert Pike* and *Mr. Robert W. Johnson* for the appellees.

MR. JUSTICE SWAYNE delivered the opinion of the court.

A brief statement of the facts of this case is necessary to render intelligible the conclusions at which we have arrived. Joseph W. Clay, of the State and county of Arkansas, died intestate in May, 1853. He left a widow, Sarah G. Clay, since deceased, and three minor children, — Joseph W. Clay, also since deceased; Mary S. Clay, since married to Thomas G. Tate; and Caroline Clay, since married to Raynor W. Whitfield. The four parties last named are the appellants.

Thomas Fletcher, the brother of the widow, was appointed by the Probate Court of the proper county administrator of the estate, and qualified as such in July, 1853. Immediately after qualifying he took possession of all the property which belonged to the intestate at the time of his death. It consisted of lands, stock, farming utensils, slaves, and a small amount of money. The value of the lands at that time does not appear. The appraisers estimated the other property at $129,445.54. The slaves were an important item. They were inventoried at $113,400, leaving the balance of other assets $16,045.54. The indebtedness of the estate represented by the claims pre-

sented and allowed by the administrator amounted to $103, 436.62. According to the law of Arkansas, the widow was entitled to the possession and use for life of one-third of the lands and of one-third of the slaves, irrespective of the claims of creditors. She was also invested with the absolute owner-ship of one-third of the personal property.

The condition of the estate as regards the means of meeting its liabilities is thus clearly presented. It requires no argument to show that forced sales by the administrator to pay the debts would have involved disaster, if not ruin, to the family of the deceased. Such is the teaching of all experience. The intestate had been largely engaged in raising cotton. The administrator put himself, as it were, in the place of the deceased. Every thing was carried on and conducted as before his death. Pay-ments were made to the widow from time to time, the children were supported and educated, the taxes were paid, crops were raised, the cotton was sold, and the debts were discharged as fast as the circumstances permitted.

In 1855, the legislature passed a law whereby the probate courts were empowered to authorize administrators to do as the administrator in this case did, provided that the time limited for the settlement of estates, which was three years, should not be extended. The administrator here claims that he received such authority pursuant to this act. This fact does not appear. But it does appear that he made five full settle-ments with the Probate Court, — the first one in 1855 and the last in 1870. The accounts are in the record. They exhibit all his receipts and disbursements, and fully the manner in which he was discharging the duties of the trust. It does not appear that exception was taken by or in behalf of those con-cerned, nor that the Probate Court interposed any check or objection. The administrator made no charge for compensa-tion, and was allowed none. By the year 1858 he had paid nearly all the debts. Before the late civil war began he had paid them all but the debt upon which this suit is founded.

The commencement of the war was the beginning of the troubles of the trust. The State was a battle-field. Troops on both sides were there. The slaves were sent to Texas for safety. The mules and other live-stock were swept away by

the advancing and receding tides of the conflict. The lands hardly paid the expenses of cultivating them. Finally the slaves as property were stricken out of existence. This involved a loss to the estate, according to the original inventory, of more than $113,000 of the assets. The administrator became wholly unable to pay this debt. The answer avers, that, but for the war, he could, by the year 1863, have extinguished this demand also, and have then handed over to the heirs a large and unincumbered estate for distribution among them. The record shows that this was not an over-sanguine calculation. The calamity was unforeseen, and one for which the administrator was not responsible. The claim sought to be collected by this proceeding was an account due from the intestate to Sweeney, Greene, & Co. They became insolvent, and assigned it to Hewitt, Norton, & Co. They also became insolvent, and assigned it to the creditors for whose benefit this suit was instituted. The object of the bill is to subject the lands of the intestate to the payment of the debt. It is alleged that all the other assets have been exhausted.

It appears in this connection, that, after the claim was assigned to Hewitt & Co., they became the factors of the administrator for the sale of the cotton which he should raise, and furnished him with money and supplies to carry on the business in which he was engaged for the benefit of the estate. It was agreed that the accounts of the parties should be settled annually, and that the balances found due upon such settlements to the administrator should be applied as credits upon the assigned indebtedness. This was done, until the dealings of the parties were put an end to by the war. For several years thereafter the administrator rented out the lands. Whether leased out or cultivated, they yielded but little. There being no prospect of the voluntary payment of the original debt, the complainants filed their bill, as before stated, to enforce its liquidation.

The appellants filed an answer and a cross-bill. They set up, amongst other things, that the accounts of the dealings between the complainants and the administrator contained overcharges in behalf of the former; that the proper credits had not been given on the original debt; that the conduct of

the administrator in the management of the estate was unwarranted and illegal ; that he was guilty of a *devastavit ;* and that the entire proceeds of the cotton transmitted by the administrator to the complainants should have been applied by the latter in satisfaction of the original debt of the estate. The accounts and the original demand were referred to a master. He revised the accounts, allowed further credits; and ascertained the amount still due. Both parties excepted. The exceptions were overruled. The court adopted the finding of the master as to the amount due upon the demand in question, decreed that it should be paid within the time specified, and that in the event of default the lands described in the bill should be sold as directed, and the proceeds applied as prayed by the complainants.

The appellants thereupon removed the case to this court for review.

Our further remarks will respond to the several objections without naming them specifically, taken here to the decree below.

The power of courts of equity in this class of cases is ample. Their flexible jurisdiction is always applied as the substantial interests of right and justice may require. *Hook* v. *Payne,* 7 Wall. 425 ; *Yates* v. *Hambly,* 3 Atk. 363 ; s. p. 2 id. 263 ; *Thompson* v. *Brown,* 4 Johns. (N. Y.) Ch. 631.

The conduct of the administrator in the present case, though without the sanction of strict law, did not involve a violation of duty for which a court of equity will hold him responsible, nor the commission of a *devastavit.*

In *Thompson* v. *Brown, supra,* the intestate had been a member of a trading firm. The administrator permitted his capital to remain in the concern. He also put in other capital belonging to the estate. The survivors failed, and became insolvent. It was sought to make the administrator liable for both the capital which he left in and that which he put in. In an able and learned examination of the subject by Chancellor Kent, he was held bound for the latter, but not for the former. In his opinion, the Chancellor remarked : " It is said that a court of equity will sometimes appoint a person to carry on a trade for an infant partner. Montague on Partnership, 187, and *Sayer* v. *Bennet,*

there cited. ·And Lord Mansfield, in the case of *Barker* v. *Parker*, 1 T. R. 295, observed, that he remembered many instances of trade being carried on under the direction of a court of equity." See also *Wedderburne* v. *Wedderburne*, 22 Beav. 84, and *Ryves* v. *Coleman*, 3 Atk. 439. In *Thompson* v. *Brown*, the Chancellor quoted with approbation the language of Lord Hardwicke, in *Knight* v. *The Earl of Plymouth*, 3 Atk. 480, Dickens, 120, as follows: "If there was no *mala fides*, nothing wilful in the conduct of the trustee, the court will always favor him. For a trust is necessary in the concerns between man and man, and which, if faithfully discharged, is attended with no small degree of trouble and anxiety. It is an act of great kindness in any one to accept of it. To add hazard or risk to that trouble, and to subject a trustee to losses which he could not foresee would be a manifest hardship, and would be deterring every one from accepting so necessary an office." The same rule was applied by this court in *Markey et al.* v. *Langley et al.*, 92 U. S. 142.

A clearer case for the application of this principle can hardly occur than is presented by the one before us. Throughout the record there is not the slightest imputation, nor apparent ground for any imputation, against the administrator. Even a want of care, diligence, or good judgment is not alleged. His management was eminently successful, until the war occurred. That could neither be foreseen nor averted. It fell with crushing weight upon him. His plan for the redemption of the estate was at once broken up. The means of prosecuting it further were finally lost. In the wreck, nothing was left but the lands, and they without the means of turning them to any account. To hold him responsible for these consequences would be alike contrary to the dictates of reason and justice, and to the settled law of equity. Remonstrance or objection from any quarter, until after the institution of this suit, is nowhere disclosed. In the light of this record, nothing that he did can be lawfully challenged.

According to the laws of Arkansas, there can be no *devastavit* which will sustain an action until an order to pay creditors has been made by the Probate Court, and violated by the administrator. *Oatlaw* v. *Yell*, 5 Ark. 473; *Gordon* v. *The State*,

11 id. 12; *Baker* v. *The State*, 21 id. 405; *Brinkley* v. *Willis*, 22 id. 6. Here no such order is shown. *De non apparentibus et de non existentibus eadem est ratio.* In that State, a claim allowed by the administrator, and allowed and classified by the Probate Court, has the dignity and effect of a judgment. Gould's Dig., c. 4, sect. 115; *Cossit* v. *Biscoe*, 12 Ark. 95; *McMorrin* v. *Overholt*, 14 id. 244. Such was the *status* of the claim here in question.

No discrimination is made by the law of that State between real and personal property as assets. Both are in the hands of the administrator, under his control, and liable to be subjected to the payment of debts. Neither can be sold, unless the will of the testator or an order of the Probate Court so direct. Dig. Stat. of Ark., 1848, sect. 62, c. 4; id., p. 122, sect. 96, c. 4.

The accounts of an administrator settled by the Probate Court cannot be collaterally attacked or questioned. They are conclusive, until impeached for fraud or mistake in a direct proceeding in equity, instituted for that purpose. Dig., sect. 111, c. 4; *Clarke* v. *Shelton*, 16 Ark. 480; *Dooley* v. *Dooley*, 14 id. 124.

Henry Paige acquired the entire interest in the estate of Joseph W. Clay, Jr., deceased, in his lifetime, by proceedings in bankruptcy. Paige made himself a party to the suit by obtaining leave to file an answer. The answer does not appear in the record; but that does not render the entry of his appearance the less effectual.

The debt was sufficiently proved as against the heirs, as well as against the administrator. The action of the Probate Court gave it the effect of a judgment as to both. The amount due upon it was found by the master. The correctness of that finding was not questioned here by the counsel for the appellants.

The exhaustion of all the assets except the lands is clearly shown by the record. The accounts of the administrator, as settled by the Probate Court, cover this ground. In the state of the record they are conclusive. There is also proof of the original amount of the debts and assets, of the amount of the former which had been paid, and of the loss of assets by the manumission of the slaves. In this view, also, it is clear

there could have been no personal assets in the hands of the administrator.

The validity of the administrator's dealings with the complainants has been already sufficiently considered.

The administrator was a trustee for the creditors, as well .as for the heirs and distributees. *Payne* v. *Hook, supra; Baker* v. *Grimes*, 21 Ark. 405; *Brinkley* v. *Willis*, 22 id. 6. The administration of the estate was in progress. There had been no order by the Probate Court that the debts should be paid and a final settlement made. The administrator had done nothing in hostility to the claim. On the contrary, besides allowing it, he had made payments upon it from time to time. The Statute of Limitations can have no application.

The assignment by Sweeney, Greene, & Co. to the complainants is admitted by the answers of Tate and wife, and by that of the administrator. The evidence on the subject was not objected to in the court below, and, therefore, cannot be objected to here. The assignment could have been well made by parol. *Ford* v. *Stewart*, 19 Johns. (N. Y.) 344. The point was not made before the master, when he found the amount due, nor, so far as appears otherwise, in the court below. The report was excepted to by the appellants, but not upon any ground affecting this subject.

The assignment was made in New Orleans, and appears to have been according to the law of Louisiana. Morgan's Code, sect. 2233; *Griffin* v. *Cowan*, 15 La. Ann. 488; *Scott* v. *McDougall*, 14 id. 310; *Dennison* v. *Duplissis*, 12 La. 9.

It rested in the discretion of the court to order the sale of the whole or of a part of the lands. It is not shown that the sale of less than the whole will yield a sum sufficient to meet the requirements of the decree. Error is never to be presumed: it must be made clearly to appear. The execution of the decree will be under the control of the court below; and care will doubtless be taken that no wrong in this respect is done to the appellants.                                    *Decree affirmed.*