Nott, J.,
delivered the opinion of the court:
It is indisputable that-, if the claimant had remained in the South during the war, and had served in a Confederate regiment, instead of coming to the North when Georgia seceded and serving in a United States regiment, he would have acquired a valid title to the cotton and been entitled to recover its proceeds by this suit. The only question in the case is whether certain decisions of the Supreme Court extend to and invalidate such a title as this.
The distinguishing. feature of the case is the domicile of the claimant. At the outbreak of the rebellion his domicile was in Georgia. Like many other loyal persons, the claimant, foreseeing the impending war, abandoned his business and sought a refuge within loyal territory. A change of domicile is not shown by the evidence, and no court would imply it against a refugee flying for safety amid such circumstances. A person may change his residence without changing his domicile, and an eminent judge has held that there was no change of domicile where the party removed from New Jersey to New York, resided there for two years, hired a house to dwell in, and described himself in deeds as of the city of New York. (1 Brad., 69.) Probably the claimant did not know when he left whether he would return or not. The unprecedented conditions of the situation were such that no man could tell how long the storm would last or how quickly it would end. Doubtless, if a happy termination of the then portending trouble had come, the claimant would have returned to his home and business. A domicile is not lost *369 until another is acquired 5 and none such being shown, the court must assume that when the cotton in suit was bought by his agent, the claimant remained domiciled in Georgia.
So far as the present case is concerned, the amount involved is trivial, but the principle upon which it is to be decided may have a far-reaching effect and involve the rights and interests of many other persons. During the war numerous regiments were enlisted by the Government composed of loyal citizens of the seceded States. These persons were thereby brought within our military lines, and sometimes within the territory of the loyal States. When they left their homes to take up arms for the Government, they ordinarily left their wives to act as their agents in the management of their property or gave a power of attorney to a friend. Is it to be held now that they should have known and anticipated that by the act of crossing the lines they and their wives would become, constructively, enemies ; that all prudential business arrangements would be utterly extinguished, and that years after the war a form of judicial forfeiture would be consequent upon their other sacrifices and attach strictly to then personal adherence to the Government ?
Again, there were thousands of refugees who fled or were forced within our lines during the wTar, such, for instance, as the late President of the United States, Mr. Johnson, or the late Senator from Tennessee, Mr. Brownlow, or a former judge of the Supreme Court, Mr. Justice Wayne. Is it to beheld that all of the ordinary business transactions of life carried on by their agents during their enforced absence were void and come constructively under the ban of non-intercourse1? It is manifest that such a rule of public policy would have been most prejudicial to the Government, and would have operated most harshly against those unfortunate persons whom the Government again and again assured of its protection.
When we examine the decisions of the Supreme Court, we find that no such principle has ever been enunciated by that court, and, on the contrary, that domicile has always been treated as a controlling fact in its decisions.
In Grossmeyer’s Case (7 C. Cls. R., 129), the claimant was domiciled in W ashington; whereas the agency was established after the war began, and the purchases were made by the agent within the Confederate lines. In La Pene & Ferre (8 id., 165), the claim *370 ants were domiciled in New Orleans, and tlie agency was created there while it was still under Confederate-authority, but the purchases were made by the agent within the Confederate lines after he had become separated from his principals by the capture of the city.
So far the presence of the claimant at the time of the transaction coincided with the place of his domicile; and if the cases had stopped with Grossmeyer and La Pene, it might be said that the place of the domicile was not the controlling fact which rendered this commercial intercourse illegal. But in Warren Mitchell's Case (10 id., 120), the claimant at the time.of the transaction was within the Confederate lines, and he himself made the purchases without the intervention of an agent. Here, then, was a case where the Supreme Court must decide whether the personal presence of the claimant or the place of his domicile should control in determining the legality or illegality-of his commercial transactions with the enemy on enemy’s territory. That court held that the domicile controlled, and that inasmuch as the claimant was domiciled in Kentucky when the war began and no change of domicile was shown, his transactions were illegal, and no title to the purchased property was acquired.
Again, and more noticeably in Desmare’s Case (12 id., 26), the claimant was an officer in the Confederate army, but his domicile at the beginning of the war had been in New Orleans, and no change of domicile was shown. At the place of his official residence he bought cotton after the place of his domicile had passed by capture into the permanent possession of the United States forces. And again the Supreme Court held that domicile controlled, and that this Confederate officer within the Confederate lines was as much prohibited from commercial intercomse with his associates as if his bodily presence were then actually in New Orleans, the place of his domicile. In other words, the Supreme Court has never held that the accidental whereabouts of the claimant’s person determines whether his commercial intercourse with the enemy was lawful, and has always held that the legality of the transaction depends upon the locus of his domicile.
Again, there are the cases of American citizens temporarily in belligerent territory. Let it be supposed that in a foreign war — that in the war of 1812, for instance — an American citizen domiciled in this country was constrained by the dangers and *371 difficulties of tbe voyage to remain in England during hostilities. Can it be maintained that an antecedent agency, created before the war began in this country, would cease, and that he and his agent would become enemies, as though he were really domiciled on British territory ? Assuredly no such result can be attributed to the decisions of the Supreme Court. That court doubtless had such instances in view when it decided in Des-mare’s Case that the locus of the domicile determines the status of the person, and that a Confederate officer resident on Confederate territory was constructively dwelling in New Orleans, and thereby prohibited from holding commercial intercourse with all persons in the insiu’rectionary district.
It is not to be understood or supposed that this doctrine of the Supreme Court would sanction the appointment of an agent across the military lines, or that it would have conferred upon refugees within our lines a right of direct trade or commercial intercourse with the public enemy not enjoyed by our own citizens domiciled within our own lines. The only effect of domicile within the Confederate lines was to keep alive an antecedent agency, and prevent the principal and his agent from becoming, constructively, enemies. On the one hand, courts of the United States would not give effect to a new agency created across the lines after the war had begun; on the other, they would consider the refugee as constructively present at the place of his domicile. Accordingly, there is no authority for saying in the present case that the agency terminated when the war began $ and, on the contrary, it must be held that so long as the claimant’s domicile continued within the Confederate lines his agent there might continue to transact his business with the same effect as if the claimant had remained upon Confederate territory.
The judgment of the court is that the claimant recover of the defendants the proceeds in the Treasury of two bales of cotton, captured in Savannah, at $175.33 per bale, amounting in the aggregate to $350.66.