271 U.S. 272 (1926)
SUTHERLAND, ALIEN PROPERTY CUSTODIAN,
v.
MAYER ET AL.
MAYER
v.
SUTHERLAND, ALIEN PROPERTY CUSTODIAN, ET AL.
REIS ET AL.
v.
MAYER ET AL.
Nos. 232, 233, 234.
Supreme Court of United States.
Argued April 14, 1926.
Decided May 24, 1926.
APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE FIRST CIRCUIT.
*274 Assistant Attorney General Letts, with whom Solicitor General Mitchell and Messrs. Dean Hill Stanley and E.N. Cherrington, Special Assistants to the Attorney General, were on the brief, for Sutherland, Alien Property Custodian.
Mr. Edward F. McClennen for Richard Mayer.
Mr. John W. Davis, with whom Mr. John Caldwell Myers was on the brief, for Edwin Reis et al.
*284 MR. JUSTICE SUTHERLAND delivered the opinion of the Court.
These are several appeals from a decree of the court below affirming in part and reversing in part a decree of the federal district court for the District of Massachusetts. The suit was brought by the Alien Property Custodian against Richard Mayer, a naturalized citizen of the United States, two corporations, organized under Massachusetts law, Karl B. Strauss, a naturalized subject of Great Britain, and Edwin Reis and Anny Reis, in her own right as widow and as trustee for two minor children of Ludwig Reis, deceased, citizens and inhabitants of Germany, for an accounting in respect of the interest of Mayer and the German citizens in certain assets in the United States in Mayer's possession and assets in Germany in the possession of the Germans, alleged to belong to a partnership consisting of Mayer, Edwin Reis, Karl B. Strauss and Ludwig Reis.
The partnership was formed sometime prior to the declaration of war against Germany on April 6, 1917, and was existing at that time. Mayer contributed to the partnership his American business, worth slightly over 206,000 marks  less than $50,000. The German partners contributed about 2,655,000 marks. By the partnership agreement, after payment of 4 1/2 per cent. on the capital contributed and stipulated salaries, Mayer was to receive 20 per cent. of the profits, to be credited to his capital account. The partnership agreement was made in Germany, and the principal seat of the partnership was at Friedrichsfeld, Germany, with branches at Manchester, England, and in Boston. At the time of the declaration *285 of war, the partnership assets in Mayer's possession had grown to a little over $910,000, and his share in the European assets amounted to 2,414,056.12 marks. Of the amount in Mayer's possession, between $500,000 and $600,000 consisted of a balance remaining out of $2,500,000 sent to him by the German partners for the purpose of buying cotton waste.
After the declaration of war, the American assets were seized by the Alien Property Custodian; but in a suit brought against that officer they were ordered redelivered to Mayer upon the ground that he had a lien upon them for his share of the partnership capital and profits. Mayer v. Garvan, 270 Fed. 229, affirmed 278 Fed. 27. The value of the assets returned to Mayer was $828,072.72, losses having occurred which are not material to the present consideration.
In that case the court held that under the partnership agreement Mayer was entitled upon distribution to have out of the assets of the partnership the amount of his capital investment together with 20% of the net profits earned by the partnership, and was liable for 20% of all losses. There was, however, no evidence of the actual value of the American property or of the German or English property, nor of the liabilities of the firm; and this suit for an accounting followed. It is not disputed that the custodian is entitled to the American assets after deducting therefrom the amount of Mayer's share in all the assets.
The German partners entered an appearance in the present suit and produced at the hearing all the account books. The property in Manchester had been seized by the English Government and sold, leaving debts on account of the English branch, amounting to £ 35,000, which were either paid or assumed by the German partners. The district court found that a few days prior to the declaration of war the value of the German mark in the *286 currency of the United States, according to the rate of exchange then quoted, was about 18 cents. Thereafter, no rate of exchange was quoted until July 17, 1919, at which time the exchange value of the German mark was 7 7/8 cents. Thereafter, its value steadily declined, until at the time of the Act of Congress declaring the state of war at an end on July 2, 1921, it was 1.35 cents; and when the hearing was begun in the present case its value was .0048 of a dollar. The district court determined that the German partners should account for Mayer's share of the German assets at their value on April 6, 1917, the American assets to be measured in terms of the American gold dollar, and the German assets correspondingly in terms of the German gold mark, which is the equivalent of 23.82 cents of the money of the United States; and upon this basis the decree was entered. The circuit court of appeals, in affirming the decree, adopted the same view. Sub nom. Miller v. Mayer, 1 Fed. (2d) 419. And this presents the principal question in the case and the only one requiring extended consideration.
Appellants in Nos. 232 and 234 unite in the contention that the declaration of war did not affect the title to the partnership property; that although the partnership was thereby dissolved the partners must suffer ratably from any depreciation in the value of the German assets after the dissolution and before the accounting; and that the accounting must be made upon the basis of the value of such assets at the time of the accounting, the value of the mark being taken at its then rate of exchange.
That the declaration of a state of war immediately effected a dissolution of the partnership is well settled and is not in dispute. It is likewise settled that during the war all intercourse, correspondence and traffic between citizens of this country and of Germany, which would or might be to the advantage of the enemy, were absolutely forbidden. Conrad v. Waples, 96 U.S. 279, 287; Briggs *287 v. United States, 143 U.S. 346, 353. The effect of War Trade Regulations No. 802, July 14, 1919, and No. 814, July 20, 1919, we shall consider further along.
The reasons for, and the limitations upon, the rule have been frequently stated. War between nations is war between their individual citizens. All intercourse inconsistent with a condition of hostility is interdicted, The Rapid, 8 Cr. 155, 162-163, for fear that it may give aid or comfort to, or add to the resources of, the enemy. Moreover, as said by this court in United States v. Lane, 8 Wall. 185, 195, "If commercial intercourse were allowable, it would oftentimes be used as a color for intercourse of an entirely different character; and in such a case the mischievous consequences that would ensue can be readily foreseen." But war is abnormal and exceptional; and, while the supreme necessities which it imposes require that, in many respects, the rules which govern the relations of the respective citizens of the belligerent powers in time of peace must be modified or entirely put aside, there is no tendency in our day at least to extend them to results clearly beyond the need and the duration of the need. The purpose of the restriction is not arbitrarily and unnecessarily to tie the hands of the individuals concerned, but to preclude the possibility of aid or comfort, direct or indirect, to the opposing forces. It is that purpose which gives birth to the rule and indicates its limits. The rule is simply "a belligerent's weapon of self-protection." Daimler Co. v. Continental Tyre, etc., Co., [1916] 2 A.C. 307, 344. And it applies even where the trading is with a loyal citizen, if he be resident in the enemy's country, since the result of his action may be to furnish resources to the enemy. Id., 319; Janson v. Driefontein Consolidated Mines, [1902] A.C. 484, 505. The whole tendency of modern law and practice is to soften the "ancient severities of war," and to recognize, increasingly, *288 that the normal interrelations of the citizens of the respective belligerents are not to be interfered with when such interference is unnecessary to the successful prosecution of the war. Private rights and duties are affected by war only so far as they are incompatible with the rights of war. See, generally, Kershaw v. Kelsey, 100 Mass. 561, 568-574, where the question is elaborately reviewed in an opinion by Mr. Justice Gray which has several times received the approval of this court; Briggs v. United States, supra, p. 353; Williams v. Paine, 169 U.S. 55, 72; Birge-Forbes Co. v. Heye, 251 U.S. 317, 323.
Thus, where a contract has been performed before the advent of war and nothing remains but the payment of money, the right to collect is not destroyed, but only the remedy suspended until the termination of the war. Hanger v. Abbott, 6 Wall. 532, 537; Brown v. United States, 8 Cranch 110, 123; New York Life Ins. Co. v. Statham, 93 U.S. 24, 31; Crutcher v. Hord and wife, 67 Ky. 360, 366; Mutual Benefit Life Ins. Co. v. Hillyard, 37 N.J.L. 444, 465. Agencies, created before the war, and not requiring intercourse across the enemy's frontier, such as for the collection of debts, preservation of property, and so forth, are not terminated by war. See, generally, Ward v. Smith, 7 Wall. 447, 452-453; Quigley's Case, 13 Ct. Cl. 367, 371; Anderson v. Bank, 1 Fed. Cases 838, No. 354; Lamar v. Micou, 112 U.S. 452, 464. And in the case of contracts made before the war for the delivery of goods, it is entirely lawful to make delivery during the war within the United States. The thing forbidden is placing property or money within the power of the enemy, "not in delivering it to an alien enemy, or his agent, residing here, under the control of our own government. . . . In such a case, the interests of commerce are perfectly compatible with the rights of war; and public policy does not forbid the transfer." Buchanan v. Curry, 19 Johns. 137, 141.
And so here, we have to deal not with a contract made during the war or requiring commercial or other intercourse *289 across military lines, but with an adjustment of rights, after the restoration of peace, under lawful articles of partnership entered into before, and existing at the outbreak of, the war. The advent of a state of war put an end to the partnership and postponed all remedies relating to the dissolution; but it did not petrify rights and duties resulting therefrom. Its effect only was to suspend the enforcement of the obligation of each of the partners in respect of the assets and past transactions of the partnership; and the essential inquiry now is: What was the obligation which resulted from the dissolution?
Upon the dissolution of a partnership, the general rule is that the liquidating partner or partners must settle up the partnership affairs within a reasonable time and, after payment of the partnership debts and liabilities, divide the proceeds among the partners according to their interests. Clay v. Field, 138 U.S. 464, 473. The rule is not different because the dissolution is the result of war. Stevenson & Sons v. Aktiengesellschaft, etc., [1918] A.C. 239, 246. But in the case of such a dissolution, in the absence of legislation to the contrary, a settlement is legally impossible until the close of the war, because of the rule forbidding intercourse across the enemy's frontier and denying access by enemy citizens to our courts; although it is entirely compatible with the rule to recognize the right and duty of the enemy partners to care for and preserve the assets of the co-partnership in the possession of each for their mutual benefit when the war has ended. To say otherwise, because an enemy may realize a benefit after the war has come to an end, is utterly to misapply the principle upon which the non-intercourse rule is based and to confound the suspension of the remedy with the loss of the right. "The prohibition against doing anything for the benefit of an enemy contemplates his benefit during the war and not the possible advantage he may gain when peace comes." Daimler Co. v. Continental *290 Tyre, etc. Co., supra, p. 347; Stevenson & Sons v. Aktiengesellschaft, etc., supra, pp. 249, 253, 254.
In the present case, the adjustment of the account as among the partners is a matter in which the government  the war and the exigencies of the war having passed  is no longer concerned, save as its rights and duties are represented by the Alien Property Custodian. Except for the latter consideration, we are dealing with a simple suit for an accounting among partners, to be determined by the application of equitable principles. Stevenson & Sons v. Aktiengesellschaft, etc., supra, p. 248. The effect upon these principles of the dissolution of the partnership by war is certainly no greater than if it had been dissolved by death or agreement. Buchanan v. Curry, supra, pp. 142-143. In either event the relation created by the dissolution in respect of the assets is a fiduciary relation, and adjustments of rights and liabilities of the partners inter se are to be made in accordance with the rules governing such relationships; and in a court of equity the American partner, ipso facto, has no such exceptional privilege as will permit him to secure more favorable consideration than that to be accorded to his alien partners.
The argument for Mayer is that the German partners should be treated as having purchased the German assets on April 6, 1917, and compelled to account for Mayer's interest therein upon that basis and as of that date. In support of that contention we are referred to the record in the original case of Mayer v. Garvan, supra, of which the district court in the present case took judicial notice. That record has not been before us; but we accept the statements contained in Mayer's brief in respect of its disclosures, since they do not seem to be challenged by the other parties. We are of opinion, however, that they fall short of establishing a situation for applying the theory of a purchase of the German assets by the German partners.
*291 Undoubtedly, the German partners, instead of liquidating, continued to use the assets after the dissolution in a going business, commingling old assets with new. Also, they took in a new partner. The court of appeals said, and evidence is quoted from the Garvan record to the effect, that the assets were taken over by the German partners and thereafter treated as their own. The evidence before us in the present record is to the effect that the business in Germany was carried on during the war as it had been before; that Mayer's share of the profits was credited to him annually in the private ledger at Friedrichsfeld; and that a sum sufficient to pay out Mayer's capital interest, as shown by the books, was continuously carried on deposit in banks.
Precisely what are the facts in respect of this matter we need not stop to determine, because, in view of the conclusion we have reached, it is not material whether the German partners treated the business as their own or as that of the old partnership. The partnership was at an end; and their duty was to liquidate. They could not carry on the business in any form so as to bind Mayer. But Mayer must elect either to accept what was actually done, with the burdens and benefits, or to enforce against his German partners a liability based upon what they should have done. The decision below and Mayer's attitude apparently proceed upon the latter alternative, and in that view, in an ordinary case, he could justly be given no more than what he would have obtained if the liquidation had in fact been made within a reasonable time and the amount of his share promptly paid over to him. Precisely at this point, the contention in Mayer's behalf breaks down, for it ignores the circumstance, which differentiates this from the ordinary case, that, even if the assets had been promptly liquidated, nothing could have been paid to Mayer until after the removal or expiration of the non-intercourse bar. Until that time, the amount *292 coming to Mayer necessarily would have been held by the German partners in the form of German currency, or of securities or a bank account payable in such currency, and the loss, so far as Mayer is concerned, would have resulted none the less.
In this connection the fact may not be disregarded that the German partners dealt with a situation under the abnormal restraints and perplexities of war; and it is fair to interpret what they did in the light of that situation. So viewed, we are unable to conclude that their acts were hostile to Mayer's ultimate rights or inconsistent with an honest effort to do the best possible thing with the property until the close of the war, utilizing it, in the meantime, in a way which they conceived to be to the best advantage of all concerned. It is clear that no loss was sustained by the continuance of the business; but, on the contrary, there was an asset gain. The great loss, which finally resulted, and which was little short of being complete, was due entirely to the depreciation in the value of the German mark and not to any lack of care or good faith on their part. Moreover, with the exception of plant and machinery, relatively of small value, the German assets during the entire time were in the form of German paper currency or securities, bills receivable, etc., convertible only into German paper currency, since there was no gold in circulation and the paper currency was by German law legal tender.
In whatever aspect the case is viewed or upon whatever basis the liability of the German partners be made to rest, the loss, in the final analysis, was an ineluctable consequence of the war. Is it to be borne by them alone or to be shared equally by all the partners as a common misfortune beyond the power of any of them to turn aside? That question justly cannot be solved by a strict enforcement of the ordinary rule as in ordinary cases, for here we are dealing with extraordinary and anomalous *293 conditions, as a result of which money values were swept away by immense causes as much beyond the sway of the German partners as of Mayer. Blame for such a situation rests upon neither; and equality is equity.
This would appear more clearly if there were no American assets and the German assets were alone concerned. In that event, a decree compelling the German partners to account to Mayer upon the basis of the full value of these assets at the outbreak of the war in terms of gold, notwithstanding the destructive force of these unavoidable circumstances, would be so obviously harsh and inequitable as to shock the conscience of the chancellor. But the equities are not different because Mayer chances also to have in his possession partnership assets  the greater part of which, it may be said in passing, had been sent to him by the German partners for trade purposes  which, by reason of the more fortunate state of American finances, had preserved their original monetary value.
Upon the whole, we think the case is fairly ruled in principle by Clay v. Field, supra. In that case, the property of the partnership consisted of a plantation in Tennessee. Prior to the outbreak of the Civil War, one of the partners died. The surviving partner continued, after his partner's death, to retain possession of the plantation, together with the slaves upon it, and to operate the property in good faith. When the war came a year or two later, the plantation was in the theatre of conflict, and at the close of the war the slaves had become free. The court recognized the general rule, as we have already stated it, that it was the survivor's duty to settle up the partnership affairs within a reasonable time and pay over to the representatives of the deceased partner the amount due them. And the court proceeded to say (pp. 473-474) that "if he [the survivor] takes the responsibility of continuing the business of the firm, and using the property *294 of the partnership, he becomes liable for losses that may occur, and it is in the option of the representatives of the deceased partner either to insist upon a division of the profits, which may be made in thus carrying on the business, or upon being paid the amount of the deceased's share in the capital, with lawful interest thereon, after deducting his indebtedness to the firm." Strictly applied, the court said, the rule would entitle the representatives to call for an account of the share of the deceased at the time of his death with lawful interest. But, in view of the anomalous circumstances and unexpected events, the court declined to enforce the rule, saying (p. 474): "In our view, equity, when called upon to settle the mutual rights of the parties, may very properly mitigate the hardships of the rule, especially when, as in this case, the loss has occurred by public war." It was recognized that the survivor "might have sold the slaves and other property on terms which, in the light of subsequent events, would have been greatly to the advantage of his brother's estate, yet it seems clear from the evidence that the reason he did not sell was that no opportunity offered of effecting a sale of the plantation at what he deemed an adequate price." Under all the circumstances, this court agreed with the trial court that it would be a very hard application of the general rule relating to a dissolution of partnership to compel the survivor or his estate to account for the value of the slaves, which, in a short time, were freed by operation of law and no longer articles of property. It was, therefore, held that the surviving partner was not accountable for the value of the slaves, but was accountable for the fair rental value of the property, including that of the slaves while they were slaves. See also, Tate v. Norton, 94 U.S. 746, 747-748.
Here the case for the German partners, if anything, is stronger; for, during the non-intercourse period, there never was a time when, so far as appears. Mayer's share *295 could have been converted into anything but German marks, or when it was legally possible to pay the amount to Mayer. As soon as the non-intercourse restriction ceased to be operative, however, such payment became lawful, and an obligation arose on the part of the German partners to make it, since Mayer's share, long prior to that time, had been identified and was separable from the body of the assets. It was, in effect, a trust fund, in respect of which the German partners then owed the duty of prompt settlement. The war was formally declared to be at an end by the Act of July 2, 1921; but the right of commercial intercourse and of communication between citizens of this country and Germany was restored by the War Trade Board regulation of July 14, 1919, as amended July 20, 1919. We, therefore, conclude that the German partners should be charged with the amount of Mayer's share of the German assets at the exchange value of the German mark on July 14, 1919. The evidence in the record shows that on July 17th, three days later, the exchange value was 7 7/8 cents, which seems near enough to the designated date. The depreciation of the German mark was so great that to compute its American monetary value on a nominal par basis would be to indulge in a pure fiction; and exchange values must be resorted to as the only available method of measurement. The conclusion that the exchange value of marks in American money is to be taken as of the time when commercial intercourse, and, therefore, settlement, first became lawful, rather than at the time of the accounting, finds support, by analogy, in many decisions. See, for example, Hicks v. Guinness, 269 U.S. 71, 80; S.S. Celia v. S.S. Volturno, [1921] 2 A.C. 544; In re British American Continental Bank, [1922] 2 Ch. 575; Societe des Hotels v. Cumming, [1921] 3 K.B. 459; Di Ferdinando v. Simon, Smits & Co., [1920] 3 K.B. 409; Lebeaupin v. Crispin, [1920] 2 K.B. 714.
In fixing the date upon which exchange should be calculated, the inevitable delay which must result before a *296 judicial taking of the account must be given weight. If the liability be treated as having crystallized at the time indicated above, then a definite date is fixed for the ascertainment of exchange and the amount when found may be awarded without regard to the fluctuations in the possible date of accounting. Lebeaupin v. Crispin, supra, p. 723. In England the rule has been applied in a winding-up proceeding upon the ground that a date must necessarily be fixed on which liabilities are to be treated as definitely ascertained for the purpose of properly conducting the later winding-up of the company's affairs. In re British American Continental Bank, supra, p. 582. And the rule is the same whether the contract is to be performed in England or out of England, on the ground that there should not be varying rules in such cases. Lebeaupin v. Crispin, supra, p. 723.
The remaining questions in dispute require only brief consideration.
The district court held that it was impossible to calculate the profits which should be equitably assigned to Mayer's share in the German assets, and that, since there could be no payment to him during the period of non-intercourse, interest could not be allowed him upon such share,  applying the rule laid down in Brown v. Hiatts, 15 Wall. 177. But the question there arose in respect of a debt which became payable during the progress of the Civil War, and the court held that, since the debt could not be paid until the termination of the war, interest upon it could not be exacted. Here we are not dealing with the question of interest upon a debt, or really with interest at all except as a term of convenience; but with that of an allowance in lieu of unascertainable profits, to which the rule in the Hiatts Case has no application. Stevenson & Sons v. Aktiengesellschaft, etc., supra, p. 256. An award should have been made to Mayer calculated upon the basis of interest in lieu of profits.
*297 The district court allowed the German partners a credit for 266,432.40 marks paid by them to the German Government during the war for taxes levied against Mayer's partnership interest in 1914, 1915 and 1916. It appears that, if the tax had not been paid, Mayer's share would have been liable to seizure by the tax collector. The circuit court of appeals reversed the ruling of the district court and disallowed the item. The obligation was one which apparently arose before the war, and, in the view we have taken of the relation of the German partners to Mayer's interest in the assets, we think the payment was properly made to protect the fund and that the district court was right in allowing credit for it.
Payments made during the war to relatives of Mayer do not rest upon like considerations; and we agree with the action of the circuit court of appeals in disallowing them. These payments were based upon directions, said to be of a continuing character, given before the war; but which were brought to an end by the advent of war. This results not on the ground that the payments were contrary to public policy, but upon the ground that the outbreak of hostilities produced such a fundamental alteration in the relations of the parties that we cannot assume a continuance of authority to make such payments in the absence of evidence of Mayer's assent thereto. Insurance Co. v. Davis, 95 U.S. 425, 429; Williams v. Paine, supra, p. 73.
In respect of other items, either allowed Mayer or disallowed the German partners, we see no reason to differ with the conclusions of the circuit court of appeals.
Decree reversed.